**UNITED STATES of America, Appellee,**

v.

**Howard T. WINTER,**
**Defendant-Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Melvin GOLDENBERG,**
**Defendant-Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Elliot Paul PRICE, Defendant-Appellant.**

**UNITED STATES of America, Appellee,**

v.

**James DeMETRI, Defendant-Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Charles DeMETRI, Defendant-Appellant.**

**UNITED STATES of America, Appellee,**

v.

**James MARTORANO,**
**Defendant-Appellant.**

**Nos. 79–1437, 79–1438, 79–1441, 79–1442, 79–1446 and 79–1476.**

United States Court of Appeals,
First Circuit.

Argued Dec. 3, 1980.

Decided Oct. 30, 1981.

As Amended on Denial of Rehearing
Nov. 25, 1981.

Albert F. Cullen, Jr., Boston, Mass., with whom Cullen & Wall, Boston, Mass., was on brief, for appellant in Case Number 79–1437.

Morris M. Goldings, Boston, Mass., with whom Hawkes & Goldings, Boston, Mass., was on brief, for appellant in Case Number 79–1438.

Jeffrey M. Smith, with whom Paul T. Smith, and Harvey R. Peters, Boston, Mass., were on brief, for appellant in Case Number 79–1441.

Jeanne Baker, Cambridge, Mass., with whom Barry M. Haight, Milton, Mass. and Joseph T. Travaline, Burlington, Mass., were on brief, for appellants in Case Numbers 79–1442 and 79–1446.

Richard M. Egbert, Boston, Mass., by appointment of the Court, with whom Marcus & Egbert, Boston, Mass. was on brief, for appellant in Case Number 79–1476.

Kathleen A. Felton, Atty. Dept. of Justice, Washington, D. C., with whom Edward F. Harrington, U. S. Atty. and Jeremiah T. O'Sullivan, Sp. Atty., Dept. of Justice, Boston, Mass., were on brief, for appellee.

Before ALDRICH, CAMPBELL and BOWNES, Circuit Judges.

BOWNES, Circuit Judge.

The case reaches us through two separate appeals: in the first, defendants Howard T. Winter, James Martorano, James DeMetri, Charles DeMetri, Elliot Paul Price, and Melvin Goldenberg appeal their convictions following a 46-day trial on grounds that will be outlined below; in the second, all six defendants appeal both the district court's denial of their motion for a new trial and its denial of an evidentiary hearing on that motion. Because of the nature of the case, it is necessary to describe the indictment and recount the evidence presented at trial in some detail.

## THE INDICTMENT

At the time it reached the jury, the indictment consisted of 42 counts. Count One charged that the appellants, as well as several others,[1] were employed by and associated with an enterprise, as defined by 18 U.S.C. § 1961(4)[2] of the Racketeer Influenced and Corrupt Organizations Act (RICO), which was engaged in and the activities of which affected interstate commerce. This enterprise was alleged to have been composed of individuals associated in fact to fix by bribery horse races at various

---

1. Count One named twenty defendants, of whom only nine were tried in this action. Besides the six appellants, one defendant, Norman Mercier, was acquitted, one defendant, Robert Owen, pleaded guilty during trial, and one defendant, Sidney Tildsley, was convicted, but is not involved in this appeal.

2. This section provides:

 As used in this chapter—

 (4) "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity[.]

race tracks [3] and to profit from this activity by wagering on those races. The count further alleged that, from on or about December 1973 to on or about November 1975, these individuals conspired with each other and with the Government's star witness, unindicted coconspirator Anthony Ciulla, to violate 18 U.S.C. § 1962(c) [4] of RICO by conducting the affairs of the enterprise "through a pattern of racketeering activity."

As specifically outlined in the count, the alleged scheme involved betting on fixed races at East Coast tracks and also placing bets on the fixed races through illegal off-track bookmakers throughout the country. Several defendants, including Winter and Martorano, were alleged to have financed Ciulla and others to fix races by bribing jockeys, trainers, owners, and racing officials to prevent specific horses from finishing in the top three positions in their respective races. Certain members of the enterprise, including Winter, were alleged to have utilized force and violence to ensure that bribed jockeys and trainers actually performed as promised. Winter and Martorano, among others, were named as having caused Ciulla to travel from Massachusetts to Nevada to meet with bookmakers, including Price and Goldenberg, to arrange the terms on which the outside wagering on fixed races would be handled, and to collect the resulting profits.

To effectuate the scheme, several individuals would purchase large quantities of perfecta, exacta, trifecta, or quinella tickets [5] on the fixed races. Others, including Winter, would make telephone calls in interstate commerce and discuss wagering information on those races. Winter, Martorano, Ciulla, and others drew up lists of New England independent bookmakers whom the group would cheat by betting with them on races the group had fixed, and the Las Vegas members of the enterprise, including Price and Goldenberg, would cheat Las Vegas independent bookmakers in the same way. The winnings from wagering both inside and outside the track were brought to Motorama Sales, Inc., in Somerville, Massachusetts, and divided among the group. Motorama Sales, which was owned and controlled by Winter and Martorano, was used as a meeting place for the members of the enterprise.

Finally, it was alleged that certain individuals, including Winter, Martorano, James DeMetri, Charles DeMetri, and Ciulla purchased a race horse, Spread The Word, for approximately $30,000, with the purpose of having the jockey hold it back so that it would finish poorly in several races; when the odds were high enough, it was to be entered in a race with inferior horses and allowed to win.

Count One also contained 45 overt acts, all said to have been committed to effect the objects and purposes, and to be in furtherance of the conspiracy in violation of 18 U.S.C. §§ 1962(d) [6] and 1963(a). [7] The

---

**3.** The indictment identified the race tracks involved as Suffolk Downs Race Track, East Boston, Massachusetts; Rockingham Race Track, Salem, New Hampshire; Lincoln Downs Race Track, Lincoln, Rhode Island; Pocono Downs Race Track, Plains Township, Pennsylvania; Atlantic City Race Track, Hamilton Township, New Jersey; and Garden State Park, Cherry Hill, New Jersey.

**4.** This section provides:
It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

**5.** Ciulla testified that these are forms of "exotic" wagering in which the bettor buys a ticket specifying the order of finish of certain horses. For example, in order to win on a trifecta ticket, the bettor would have to predict the top three horses and their exact order of finish.

**6.** Under 18 U.S.C. § 1962(d) it is "unlawful for any person to conspire to violate any provisions of subsection (a), (b), or (c) of this section."

**7.** Section 1963(a) provides:
Whoever violates any provision of section 1962 of this chapter shall be fined not more than $25,000 or imprisoned not more than twenty years, or both, and shall forfeit to the United States (1) any interest he has acquired or maintained in violation of section 1962,

Government further developed its theory of the enterprise's operations through these overt acts. The mechanics of 16 fixed races were set out in detail. Included in this were descriptions of three separate incidents of violence, in which certain members of the enterprise beat up a trainer and two jockeys as part of the scheme. Also described were trips taken by Ciulla to Las Vegas to make plans with and to pick up large winnings from Nevada bookmakers, including Price and Goldenberg. James Martorano was identified as the person responsible for investing the enterprise's profits in legitimate businesses. An attempt by Ciulla, Winter, and Martorano to invest some of the enterprise's profits through the purchase of the Squire Lounge, a topless, go-go establishment in Revere, Massachusetts, was outlined.

In its final form, Count Two, which incorporated Count One by reference, charged Winter and Martorano with conducting the enterprise's affairs through a pattern of racketeering activity as defined in 18 U.S.C. §§ 1961(1)(B)[8] and 1961(5).[9] This pattern included racketeering acts as charged in Counts Three through Forty-Two and Violations of 18 U.S.C. §§ 224,[10] 1952,[11]

---

and (2) any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over, any enterprise which he has established, operated, controlled, conducted, or participated in the conduct of, in violation of section 1962.

**8.** Section 1961(1)(B) of 18 U.S.C. provides:
As used in this chapter—
(1) "Racketeering activity" means . . .
(B) any act which is indictable under any of the following provisions of title 18, United States Code: Section 201 (relating to bribery), section 224 (relating to sports bribery), sections 471, 472, and 473 (relating to counterfeiting), section 659 (relating to theft from interstate shipment) if the act indictable under section 659 is felonious, section 664 (relating to embezzlement from pension and welfare funds), sections 891–894 (relating to extortionate credit transactions), section 1084 (relating to the transaction of gambling information), section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), section 1503 (relating to obstruction of justice), section 1510 (relating to obstruction of criminal investigations), section 1511 (relating to the obstruction of state or local law enforcement), section 1951 (relating to interference with commerce, robbery, or extortion), section 1952 (relating to racketeering), section 1953 (relating to interstate transportation of wagering paraphernalia), section 1954 (relating to unlawful welfare fund payments), section 1955 (relating to the prohibition of illegal gambling businesses), sections 2314 and 2315 (relating to interstate transportation of stolen property), sections 2341–2346 (relating to trafficking in contraband cigarettes), sections 2421–24 (relating to white slave traffic). . . .

**9.** Under this section:
(5) "pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity[.]

**10.** This section provides:
(a) Whoever carries into effect, attempts to carry into effect, or conspires with any other person to carry into effect any scheme in commerce to influence, in any way, by bribery any sporting contest, with knowledge that the purpose of such scheme is to influence by bribery that contest, shall be fined not more than $10,000, or imprisoned not more than 5 years, or both.
(b) This section shall not be construed as indicating an intent on the part of Congress to occupy the field in which this section operates to the exclusion of a law of any State, territory, Commonwealth, or possession of the United States, and no law of any State, territory, Commonwealth, or possession of the United States, which would be valid in the absence of the section shall be declared invalid, and no local authorities shall be deprived of any jurisdiction over any offense over which they would have jurisdiction in the absence of this section.
(c) As used in this section—
(1) The term "scheme in commerce" means any scheme effectuated in whole or in part through the use in interstate or foreign commerce of any facility for transportation or communication;
(2) The term "sporting contest" means any contest in any sport, between individual contestants or teams of contestants (without regard to the amateur or professional status of the contestants therein), the occurrence of which is publicly announced before its occurrence;
(3) The term "person" means any individual and any partnership, corporation, association, or other entity.

**11.** Under 18 U.S.C. § 1952:
(a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or

and 2.[12] These activities were said to be violations of 18 U.S.C. §§ 1962(c) and 1963(a). The Government withdrew the forfeiture provisions of this count on the final day of trial.

Counts Three through Forty-Two charged specific violations of 18 U.S.C. § 224 (Sports Bribery Act) and 18 U.S.C. § 1952 (Travel Act) and two violations resulting from the operation of the scheme. Most of the counts were based on incidents described as overt acts in Count One. Winter and Martorano were named in 38 of the counts, Price and Goldenberg in 15, and the DeMetris in only 2.

The jury convicted each appellant on every count in which he was named.

## THE EVIDENCE

■ Our review of the evidence, together with all legitimate inferences to be drawn from it, must be made in the light most favorable to the party prevailing below, the Government. *E. g., United States v. Tedesco*, 635 F.2d 902, 906 (1st Cir. 1980); *United States v. Izzi*, 613 F.2d 1205, 1206 (1st Cir.), *cert. denied*, 446 U.S. 940, 100 S.Ct. 2162, 64 L.Ed.2d 793 (1980). Credibility choices must be resolved in favor of the verdict. *United States v. Gonzalez*, 617 F.2d 104, 106 (5th Cir.), *cert. denied*, 449 U.S. 868, 101 S.Ct. 202, 66 L.Ed.2d 86 (1980); *United States v. Beecroft*, 608 F.2d 753, 756 (9th Cir. 1979). One of the few subjects on which the appellants and the Government agree is that the testimony of Anthony Ciulla was absolutely vital to the case. Testifying under an informal grant of immunity, Ciulla described in detail a scheme that—not surprisingly—neatly dovetailed with the indictment.

### Formation of the Enterprise.

According to Ciulla, he first met with Winter in connection with this plan at a bar called the Back Room in Somerville in late 1973. There Ciulla agreed that he and his partner Barnoski, a fugitive at the time of the trial, would deal directly with jockeys and trainers in fixing horse races. Winter in turn agreed that he and his partners would finance the scheme, place outside bets with illegal bookmakers and collect money from them, and supply runners. Ciulla was to receive 50% of the profits, to be split with Barnoski, but be responsible for all losses. Winter was to split his half with his partners, whom he said included James Martorano.

Within a month, the group met again, this time at Marshall Motors[13] in Somerville. Winter and Martorano were among those present. Ciulla testified that, during a discussion about the roles that the various participants in the scheme would play, Winter and Martorano mentioned Price and

foreign commerce, including the mail, with intent to—

(1) distribute the proceeds of any unlawful activity; or

(2) commit any crime of violence to further any unlawful activity; or

(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000, or imprisoned for not more than five years, or both.

(b) As used in this section "unlawful activity" means (1) any business enterprise involving gambling, liquor or which the Federal excise tax has not been paid, narcotics or controlled substances (as defined in section 102(6) of the Controlled Substances Act), or prostitution offenses in violation of the laws of the State in which they are committed or

of the United States, or (2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States.

(c) Investigations of violations under this section involving liquor shall be conducted under the supervision of the Secretary of the Treasury.

18 U.S.C. § 1952 (1970 & Supp.1981).

12. This section provides:

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

13. Marshall Motors was also known as Motorama; Ciulla used both names in his testimony.

Goldenberg [14] as "significant bookmakers" who could be instrumental in moving money to illegal bookmakers.

Ciulla testified that within the next two months, he traveled on Winter's instructions to Las Vegas, Nevada, to meet Price and Goldenberg to learn the tracks on whose races the most money could be bet outside with illegal bookmakers. He described two meetings with Price at the Riviera Hotel and two meetings with Goldenberg at the Tropicana Hotel. Both men promised to obtain the information that Ciulla needed. Ciulla reported back to Winter and Martorano at Marshall Motors that Price and Goldenberg would inform him of the amounts of money that could be "moved" [15] with illegal bookmakers in Las Vegas. He testified that he called Price at the Riviera and Goldenberg at the Tropicana within a week of his return from Las Vegas and learned the names of the tracks where the group would be able to move the most money.

In April or May of 1974, Ciulla met Charles and James DeMetri and their brother Peter, now deceased, for the first time. This meeting occurred at the DeMetris' truck refrigeration business, Boston Thermo-King; Winter and Barnoski were also present. Charles, James, and Peter DeMetri all agreed to participate in a race fixing scheme and to put in their names the horses that the group planned to buy. The DeMetri brothers were also in the racing business at that time and owned race horses.

At a subsequent gathering in June of that year, Ciulla, in Winter's presence, told all three DeMetris that the group planned to buy a race horse for approximately $30,000. The DeMetris would own one-half interest in the horse, and the rest of the group, including Ciulla, Winter, and Barnoski, would own the other half. Ciulla explained that he intended to reduce the apparent value of the horse by several thousand dollars in order to deceive the public into not betting on it. This would be done by holding the horse in several races. The vastly underrated horse would then be allowed to win a race unexpectedly and produce large winnings for those few who bet on it—this group to include, of course, the participants in this scheme. Winter assured James, Charles, and Peter that they would be informed of the other races that Ciulla was fixing. Ciulla assured them that he would call them so that they could bet with outside illegal bookmakers, but that Winter and his associates would be entitled to half of their winnings.

As a result of these meetings, the DeMetris supplied $15,000 of the $26,000 needed to purchase the horse Spread The Word in mid-June 1974. Louise Hicks, the DeMetris' sister, was listed as the owner on the bill of sale, and the horse was transported to the DeMetris' farm in North Reading, Massachusetts.

*The Races.*

The indictment charged that the enterprise fixed twenty separate thoroughbred horse races: at Pocono Downs on August 12, 18, and 20, and September 8, 1974; at Lincoln Downs on August 1 and December 9, 1974, and on March 20, 1975; at Rockingham Park on August 6, 1975; at Suffolk Downs on October 16, and November 6 and 15, 1974; at Garden State Park on January 11, February 4, 8, and 13, and May 22 and 23, 1975; and at Atlantic City Race Track on July 4, 12 and 17, 1975. Because the method Ciulla used to fix races changed very little from race to race, we will describe in detail only one such incident: the third race at Suffolk Downs on November 6, 1974, as charged in Count Twenty-One.

14. Goldenberg has used the name Golden both socially and for employment purposes for many years. Ciulla testified that at one time Golden was the only name by which he had known Goldenberg. Later, however, he testified that he had always known that Goldenberg's name was Goldenberg, and that he had had Goldenberg paged under that name at the Tropicana.

Ciulla generally referred to Goldenberg as Golden during the trial.

15. Ciulla testified that "moving money" concerned "betting amounts of money with illegal bookmakers on a specific race on a particular day."

Ciulla testified that, on the evening of November 5, he spoke by telephone with both Barnoski and Guy Contrada. Contrada told Ciulla that he believed that the next day's third race could be fixed. At Ciulla's request, Contrada identified five jockeys scheduled to ride in the race who had been receptive to bribes in the past. As was generally the case, Ciulla was unable to recall the names of any jockeys involved in this transaction without referring to the pertinent race chart.

The next morning, Ciulla, accompanied by Richard Donati, met Contrada and Tommy Pizzi at Buddy's Cafe in Revere, Massachusetts. Pizzi was scheduled to ride the favorite in the race. He felt that it would be difficult to hold the horse, but agreed to do so for $1,500 to $2,000. Ciulla gave Contrada money to bribe the other four jockeys he had identified, for amounts ranging from approximately $500 to $1,000.

Contrada returned to the cafe from the track after paying off the four riders. Ciulla then traveled to Marshall Motors for a meeting that included Winter and possibly Martorano. He told the group to ready the bookmakers. Meanwhile, he studied the racing form and wrote out betting slips on which were noted the numbers of the horses that were not to be held. He then met the runners at or just outside the Marshall Motors garage and gave them their instructions: to purchase tickets on the horses indicated as close as possible to post time, to cash the tickets after the race, and to return with the winnings to the Winter Hill area.[16] Ciulla also informed Winter and Martorano of his choice of Raven's Nova as the outside bet[17] and told them not to bet with the outside bookmakers any earlier than necessary.

After the race, Ciulla met the runners, collected approximately $30,000 from them, and paid each a few hundred dollars for his services. At a later conversation with Winter and others, he learned that the total winnings inside and outside the track for this race totaled about $140,000.

*The Second Trip to Las Vegas.*

In late November 1974 Ciulla again traveled to Las Vegas where he met Price, Goldenberg, and Douglas Morello.[18] He saw Price twice, on both occasions at the Riviera Hotel. At the first meeting, Ciulla informed Price that he was preparing to fix races at Garden State and that he wanted to know how receptive illegal bookmakers would be to accepting bets on those races. Price felt that Garden State would be a "very good" track for outside betting. Their second meeting took place the next day; Price said it would take him several days to obtain specific information on Garden State betting. Ciulla also met with Goldenberg at the Tropicana's coffee shop on his first day in Las Vegas to discuss betting on races at the New Jersey track. Goldenberg agreed this would be "very beneficial" and asked Ciulla to contact him later for specific information.

Ciulla testified that he telephoned Price at the Riviera during the first two weeks of December from the Rhode Island home of Robert Owen, a codefendant who pleaded guilty during the trial. From an identification exhibit offered by the Government, a toll call record, he specified the date of the call as December 4. During this call Price reported that he had made substantial progress with the illegal bookmakers.[19]

16. This is the name that Ciulla used to describe the area in Somerville in which Marshall Motors was located.

17. Ciulla explained that most bookmakers would not accept bets on "exotic" races such as trifectas and perfectas. Therefore, he would choose one specific horse on which the group would place its outside bets.

18. Douglas Morello was charged in the original superseding indictment, but the trial judge dismissed the case against him, and he did not

testify at the trial. Throughout the trial, Ciulla referred to Morello as "Morelli"; we have adopted the spelling found in the indictment.

19. In February 1975 Ciulla questioned Morello about the credibility of the illegal bookmakers, asking him if "they would still be receptive if several of ... [the] horses won." Morello responded that "bookmakers out here [Las Vegas] don't believe horses can win."

*The Career of Spread The Word.*

Although Ciulla's testimony on the scheme involving Spread The Word trickled out through six days of direct testimony, we recite only the highlights. In July 1974 arrangements were made for stabling and training Spread The Word at the DeMetris' farm in North Reading, Massachusetts. It ran its first race at Rockingham Park in New Hampshire and, although the favorite, lost by about 20 lengths. Its jockey, Contrada, had a difficult time holding the horse and the stewards questioned him about its finish. After that, Spread The Word was run at a gallop for a mile or two before a race so as to exhaust it. In the two other races Spread The Word was entered at Rockingham, it finished last.

Spread The Word was then entered in a claiming race at Penn. National race track in December of 1974. The necessary steps were taken to see to it that the horse would not be claimed; it finished fourth. Spread The Word was now eligible to run in starter handicap races and could no longer be claimed.

Arrangements were made to have Spread The Word race at Garden State race track in New Jersey in January of 1975. It was entered in two races, held back in both and finished either last or next to last in each.

The groundwork had now been laid and Spread The Word was put in a race to win on February 8, 1975, the ninth race at Garden State. Three jockeys were bribed to hold their mounts, just in case Spread The Word's ability was not sufficient. The horse won as planned. The track winnings came to between $80,000 and $90,000 and about $400,000 were won on outside bets.

Plans were made to run Spread The Word in the third race at Garden State on February 22 but hold it back so it would not win. By this time, however, the racing stewards had become suspicious and scratched the horse when they were informed that it belonged to Winter, Ciulla and "the rest of the group from the Boston area." Thus ended Spread The Word's racing career.

*The Final Trip to Las Vegas.*

Ciulla testified that sometime between February 14 and February 22, 1975, he traveled from Boston to Las Vegas and met Price and Goldenberg. As was his custom, Ciulla met Price at a restaurant at the Riviera. Price told Ciulla that Winter had told him to expect Ciulla's arrival. Although he still had several illegal bookmakers to call, he handed Ciulla approximately $100,000 in $100 bills, wrapped in several packages and placed in a brown bag. He also informed Ciulla that Winter had arranged credit for him at the Riviera so that he could gamble there.

Ciulla met Goldenberg the next morning in the Tropicana's coffee shop. Goldenberg handed Ciulla several white envelopes containing about $100,000 in $100 bills and told Ciulla that he had not been able to collect all the money due, but that runners were to pick up later whatever he was not able to collect during Ciulla's stay.

Price and Ciulla met again that evening in a bar at the Riviera. Price had not been able to collect any more money from the bookmakers he had contacted, but Winter had arranged for runners to bring the balance to Boston.

Goldenberg and Ciulla met a second time the following evening at a restaurant in the Tropicana. Goldenberg mentioned that betting on the past few horses had helped him—apparently financially—because he was a "degenerate gambler" and had "blown" a lot of money. Before his departure, Ciulla also picked up $40,000 to $50,000 from Morello.

On his return, Ciulla met Winter, Martorano, Barnoski, and others at Marshall Motors. At this point in his testimony, Ciulla specified the date of this meeting as February 18 or 19, 1975. While at Marshall Motors, the approximately $250,000 that Ciulla had picked up in Las Vegas was distributed. Ciulla and Barnoski took one-half of the cash; Winter took the other half and divided it into sevenths. James Martorano took his share on the spot.

*Corroborating Ciulla.*

The remainder of the Government's case was aimed primarily at bolstering Ciulla's story. We briefly review the testimony of some of the more important witnesses called for this purpose.

The Government called as a witness a woman who had been employed as a secretary by Peter, Charles, and James DeMetri in 1973 and 1974. She testified that several meetings, attended by the three DeMetri brothers, Ciulla, and Winter, among others, were held at Boston Thermo-King during that period. She also mentioned that she overheard one conversation in which the group was discussing horses and that, when she left Thermo-King in August 1974, the DeMetris were in the process of building a track.

Vincent Mara was called to recount Owen's attempt to bribe him in order to prevent Spread The Word from being claimed.[20] Mara stated that just as Owen arrived, he spotted a man he later learned was Ciulla driving by. The Government also presented the testimony of several jockeys whom Ciulla had paid off. Each described in detail the circumstances of several fixed races at various tracks; in each case Ciulla or an intermediary offered the jockey several hundred dollars to hold the horse he was riding out of the first three finishing positions. One rider testified that Ciulla paid him a bit more for one race so that he would not only hold his horse, but also serve as an "insurance rider"—one who watches the other bribed jockeys and prevents them from winning. Another testified that he had initially refused to hold the horses he was riding, but eventually relented when other jockeys began to box him in during races causing the horse he was riding to finish poorly. Many of the races discussed by these jockeys were not part of the indictment at all.

An officer of the Pennsylvania state police testified that he observed Ciulla, Owen, Barnoski, and several others at Pocono Downs races in August 1974. On one of these dates, he observed one of Ciulla's associates spend 16 of the 20 minutes the betting windows were open buying $3.00 tickets; when he finished, he had a stack of tickets "about the size of a loaf of bread."

Another witness, who served as one of Ciulla's intermediaries, testified that Ciulla arranged for him to stable his race horse at the DeMetris' farm when it was scheduled to run at Rockingham Race Track in August 1975. In fact, the witness, as well as his horse, was a guest of James DeMetri at Ciulla's behest. The witness testified that James DeMetri picked him up at the airport and that they stopped for a drink on the way to North Reading; Ciulla and Barnoski both came into the bar later. When the witness returned to his home in New Jersey after the race, he left his horse at the DeMetri farm for an unspecified length of time, and James DeMetri refused to charge him for keeping the horse.

The Government also put into evidence neatly organized charts, listing toll calls that were made the day before, after, and of any race named in the indictment, and showing that they originated from several key locations, including the Rickshaw Inn, the Country Squire Motel, James Martorano doing business as Motorama Auto, and Barnoski's, Owen's,[21] and Ciulla's homes.

20. In August 1974 Ciulla, through Owen, had approached Vincent Mara, the racing secretary at Pocono Downs. Owen was to tell Mara that Ciulla wanted a race with a $3,000 to $3,500 claiming prize added to the racing program; Spread The Word was to be entered in it. Mara was to guarantee either that no claim would be made on the horse, or that he would notify the group if a claim was made. If a claim was entered, the enterprise wanted the choice of either not sending Spread The Word to the post, or having the rider jump off the horse in the post parade. Owen was to agree to any reasonable figure that Mara requested as payment.

Owen's meeting with Mara lasted a mere 10–15 minutes. Owen reported to Ciulla that Mara had made it clear that he would have nothing to do with the scheme; he feared that Mara would call in law enforcement officials, so Spread The Word never made the trip to Pocono Downs.

21. Owen's phone was listed under his given name, Ronald Ethier. It appears that Owen changed his name legally several years ago.

These charts included calls made to Thermo-King, the Tropicana (but not the Riviera), Ciulla's home, and to Charles DeMetri.

*The Defense.*

The Government established by direct examination, and the defense confirmed by cross-examination, that Ciulla was a liar, a cheat, and a convicted race-fixer who handed out not only money, but also cocaine and hashish, as bribes. The defense, however, consisted of more than outright denials by some of the defendants and wholesale character impeachment of the Government's principal witness by all of them. During cross-examination, Ciulla was forced to admit that his story on direct was filled with a very large number of minor inaccuracies. Several of the defendants also introduced, or discovered through cross-examination of Ciulla, evidence that directly contradicted his testimony. To indicate the extent to which Ciulla's testimony was undermined on some subjects, we mention some of the more striking inconsistencies in his story.

Howard Winter's attorney called a witness who produced a registration card from a Florida club showing that a Howard Winter had been a guest at the club from February 17 through February 25, 1975. Winter's account and daily summary sheets reflected charges throughout the period. The witness also produced a charge folio and daily summary sheets for a James Martorano that indicated that he also had visited the club over the same period of time. She viewed a home movie of Winter and Martorano allegedly taken at the resort and testified that the club appeared in February 1975 as it did in the film, although it had since undergone substantial renovation. This evidence contradicted not only Ciulla's testimony that he telephoned Winter at very specific locations in the Boston area over the two-day period surrounding the aborted Spread The Word race of February 22, 1975, but also his testimony that the money he picked up in Las Vegas was split among Winter, Martorano, and others on February 18 or 19 at Marshall Motors.

Counsel for Charles DeMetri called as a witness the owner of a travel agency, who testified that he had booked Charles DeMetri on a tour, beginning with a meeting in Boca Raton, Florida, on February 19, 1975, and concluding with a cruise on the S.S. Statendam from February 21 to March 3, 1975. Another witness, who had actually been on the tour, produced Charles DeMetri's stateroom assignment on the ship, as well as a photograph of Charles and his wife taken on board. The witness also presented a photograph taken of Charles and James DeMetri together in Boca Raton on the evening of February 20.

James DeMetri's attorney produced as a witness a business associate of both DeMetris who testified that he had flown to Florida with them on February 18 and remained with James DeMetri [22] until February 20. On the morning of February 21, he and James returned to Boston.

The testimony of these witnesses directly conflicted with Ciulla's claim that he had called Charles DeMetri at his home on February 21 and 22, and James DeMetri at his home on February 22, to discuss his strategy on Spread The Word's scheduled race of February 22.

As discussed above, Ciulla also testified that soon after his return from his second meeting in Las Vegas, he called Price at the Riviera from Robert Owen's home in Rhode Island. From a Government exhibit, he identified the date of the call as December 4. Price's attorney produced Riviera Hotel records, including restaurant receipts signed by Ciulla and phone charges, that placed Ciulla at the Riviera itself as late as December 5.

Despite the apparent holes in his testimony, however, the jury chose to believe Anthony Ciulla. This was their prerogative, and the case was properly submitted to them.

### CIULLA'S IMMUNIZED TESTIMONY

Because Ciulla's testimony was so vital to the Government's case, we first address the

---

**22.** The witness testified that Charles DeMetri left at some point during this period to meet his wife and travel to Fort Lauderdale.

appellants' claims stemming from the Government's grant of immunity to him. Ciulla testified on direct examination by the prosecutor that he had entered into an agreement with the Government, through the Special Attorney prosecuting the case, guaranteeing that in exchange for his "full and complete and truthful testimony, . . . no further charges would be brought" against him, that arrangements would be made for one state sentence to run concurrently with another state sentence, that he and his family would be relocated, and that he "would be subsidized by the federal government . . . until termination from the program." (The federal witness protection program).

■ Appellants' first contention, that this agreement impermissibly circumvented the requirements of the federal immunity statute, 18 U.S.C. §§ 6001–6005, particularly § 6002, is quickly dispatched. Appellants point to no language in the statute, perhaps because there is none, requiring that federal prosecutors follow its procedures. The Government's failure to use the statutory mechanism does not render its agreement with Ciulla unlawful. *United States v. Librach*, 536 F.2d 1228, 1230 (8th Cir.), *cert. denied*, 429 U.S. 939, 97 S.Ct. 354, 50 L.Ed.2d 308 (1976); *accord, United States v. Weiss*, 599 F.2d 730, 735 n.9 (5th Cir. 1979); *see Galanis v. Pallanck*, 568 F.2d 234, 235–36 & n.1 (2d Cir. 1977). "The decision of whether to prosecute rests in the Executive Branch." *United States v. Librach*, 536 F.2d at 1230.

■ Nor do we find the fact that the agreement was not reduced to a writing signed by Ciulla fatal to its use here especially since Ciulla and the prosecutor apparently agreed completely on the terms of their deal. Because the Government revealed the contents of its arrangements with Ciulla before trial, and Ciulla reiterated its scope at trial, we do not see how appellants' rights to either confrontation or due process were infringed. Finally, we disagree that the absence of a written agreement invited Ciulla to believe that the agreement was contingent on his performance to the Government's satisfaction. The case of *Boone v. Paderick*, 541 F.2d 447 (4th Cir. 1976), *cert. denied*, 430 U.S. 959, 97 S.Ct. 1610, 57 L.Ed.2d 811 (1977), on which appellants primarily rely, is inapposite. In *Boone* a police detective who had no authority to bind the state promised the witness that he would not arrest him for the crime under investigation or any other offense, and that he would use his influence with the Commonwealth Attorney to ensure that the witness would not be prosecuted. *Id.* at 449. The *Boone* court pointed out that "a promise to recommend leniency (without assurance of it) may be interpreted by the promisee as contingent upon the quality of the evidence produced." *Id.* at 451. That sort of situation is not presented here.

■ The appellants also contend that using a nonstatutory grant of immunity permitted the Government to elicit from Ciulla while he was on the stand the statement that he had been immunized in return for his complete and truthful testimony; if immunized formally Ciulla would only have been able to state that he was protected unless he was found to have testified falsely.[23] In the context of this case, we believe that the semantic difference between the two is a difference without a distinction. Ciulla's statement did not, as appellants claim, allow the Government to vouch for its witness's credibility. In the case on which appellants primarily rely, the Ninth Circuit noted that prosecutorial vouching for the credibility of a Government witness occurs in two ways: "the prosecution may place the prestige of the government behind the witness [by personal assurances of the witness's veracity] or may indicate that information not presented to the jury supports the witness's testimony." *United States v. Roberts*, 618 F.2d 530, 533 (9th Cir. 1980). Neither was used here. The prosecutor merely requested Ciulla to describe

---

**23.** Under 18 U.S.C. § 6002, testimony or other information compelled under the statute may be used against the witness in "a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order."

his immunity agreement; he made no attempt to communicate the idea that the Government was thereby guaranteeing that Ciulla was being truthful.

Unlike the appellants, we do not find our decision in *United States v. Miceli*, 446 F.2d 256 (1st Cir. 1971), relevant. In *Miceli*, the Government stated in its closing argument that the principal Government witness had made an arrangement to testify truthfully about the transaction in which he was involved. *Id.* at 261. We were unable to determine from the record whether this comment by the prosecutor (not, as here, by the witness) was intended to express his personal opinion about the witness's veracity, which would be improper testimony by the Government attorney. In the absence of an objection, we refused to find that the remark was plain error. *Id.* We do not believe that the prosecutor's questions here can colorably be characterized as testimony. Moreover, there was no vouching for Ciulla's credibility by the prosecutor in his final argument.

We find the situation here analogous to that in *United States v. Craig*, 573 F.2d 513 (7th Cir.), *cert. denied*, 439 U.S. 820, 99 S.Ct. 83, 58 L.Ed.2d 111 (1978), in which a key witness testified on direct examination that she understood that under the terms of her immunity agreement, "my testimony or evidence that I will give will not be held

against me as long as I tell the truth." *Id.* at 519. The Seventh Circuit did not view the prosecutor's inquiry about the witness's understanding of the agreement as a form of vouching by the Government, and noted that not only did it aid the jury, it also often provided a fertile subject for cross-examination. *Id.* We agree with this assessment. *See United States v. Creamer*, 555 F.2d 612, 617–18 (7th Cir.), *cert. denied*, 434 U.S. 833, 98 S.Ct. 118, 54 L.Ed.2d 93 (1977). *But cf. United States v. Arroyo-Angulo*, 580 F.2d 1137, 1146–47 (2nd Cir.) (cooperation agreement properly introduced only on redirect examination when witness's veracity has been attacked; not reversible error in this case to introduce agreement on direct examination in view of inevitability of defense attacks on witness's credibility and vigor of attacks actually made), *cert. denied*, 439 U.S. 913, 1005, 99 S.Ct. 285, 618, 58 L.Ed.2d 260, 681 (1978), 439 U.S. 1131, 99 S.Ct. 1052, 59 L.Ed.2d 93 (1979).

■ Nor do we think that the trial judge's jury instructions on Ciulla's immunity were a form of "judicial vouching." He repeated a key section of the agreement, adverted to the absence of a formal agreement, and strongly cautioned the jury to examine Ciulla's testimony with great care.[24] His instruction on this point benefited rather than injured the appellants.

24. The trial judge instructed the jury:

Now, you have heard testimony that Anthony Ciulla in exchange for testifying truthfully, completely and fully has been granted immunity from the government. By that I mean, and you have heard testimony to the effect, that for testifying fully, truthfully and completely Mr. Ciulla will not be prosecuted for any crimes he may have admitted in his testimony here in court, or even out of court. One who testifies with the benefit of immunity, with a promise from the government that he will not be prosecuted, does not become an incompetent witness. His testimony may be received in evidence and considered by the jury, even though not corroborated or supported by evidence.

Now, I have used the word "immunity" because, in my judgment, it is the word that applies. Immunity is usually a formal order, signed by the judge who grants it. There is no such order in this case, but, from the testimony, I believe that I am justified in telling you that the government has, in fact,

promised Anthony Ciulla will not be prosecuted for any of the crimes that have been alleged here and which he may have admitted. That is why I use the word "immunity."

This testimony should be examined by you with greater care than the testimony of an ordinary witness. You should consider that testimony and whether it is being affected by his personal interest, his personal advantage, any prejudice he might have against a defendant or any personal antagonism he might have. Also, you may consider the record of prior convictions in your evaluation of that witness's testimony; and, after such consideration, you may give the testimony of Mr. Ciulla such weight as you believe it deserves. I will repeat for you that the testimony may be received and considered by you, even though not corroborated by other evidence, and given such weight as you feel it should have. You must, however, keep in mind that the testimony is always to be received with caution and considered with great care.

■ Further, the fact that the Special Attorney who reached the immunity agreement with Ciulla was also lead counsel for the Government at trial did not automatically make that attorney a witness in the case. Moreover, there was nothing to prevent the *appellants* from calling him to the stand, and there has been no showing that the Special Attorney was the only person competent to testify about the terms of the deal.

■ Finally, we do not agree that, in light of the sustained, and in some instances, successful attack on Ciulla's testimony, the Government knew or should have known that his testimony was false, thus triggering a duty to correct the record. In view of the great numbers of races, meetings, and phone calls recounted and the number of years between the events testified about and the trial itself, some errors in memory might be expected from any witness, without indicating that he or she was lying.

## THE LEGAL SUFFICIENCY OF COUNT ONE—THE RICO CONSPIRACY COUNT

■ All appellants challenge Count One on the ground that the "case was tried as an invalid theory of RICO enterprise." The basis for this claim ended with the decision of the United States Supreme Court in *United States v. Turkette*, 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981), holding that the term "enterprise" as used in the Racketeer Influenced and Corrupt Organizations Act encompasses both legitimate and illegitimate enterprises. We find no merit in defendants' claim that Count One is unconstitutionally vague on its face or as applied, particularly in the light of *Turkette.*

The next RICO issue raised by all appellants is that Count One failed to allege any nexus between each defendant and two or more predicate crimes constituting a pattern of racketeering activity. This requires us to determine what must be charged in a RICO conspiracy count to make it legally sufficient.

We start with the basics:

It is an elementary principle of criminal pleading, that where the definition of an offence, [*sic*] whether it be at common law or by statute, "includes generic terms, it is not sufficient that the indictment shall charge the offence [*sic*] in the same generic terms as in the definition; but it must state the species,—it must descend to particulars.

*United States v. Cruikshank*, 92 U.S. 542, 558, 23 L.Ed. 588 (1875). *See also Russell v. United States*, 369 U.S. 749, 765–66, 82 S.Ct. 1038, 1047–48, 8 L.Ed.2d 240 (1926).

■ Here, as noted, the charge was conspiring to conduct the enterprise's affairs through a pattern of racketeering activity. In *Turkette* the Supreme Court held:

The "enterprise" is not the "pattern of racketeering activity"; it is an entity separate and apart from the pattern of activity in which it engages. The existence of an enterprise at all times remains a separate element which must be proved by the Government.

452 at 583, 101 S.Ct. 2528–29 (footnote omitted). A RICO conspiracy count must, therefore, charge an "enterprise" and "pattern of racketeering activity" separately. Enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). "Racketeering activity" is defined exhaustively and specifically in 18 U.S.C. § 1961(1) (commonly referred to as "predicate crimes"). It includes "any act which is indictable under any of the following provisions of title 18, United States Code: ... section 224 (relating to sports bribery) ... section 1952 (relating to racketeering). ..."

Section 1961(5) states that a

"pattern of racketeering activity" *requires at least two acts of racketeering activity,* one of which occurred after the effective date of this chapter and the last

of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act or racketeering activity[.] (emphasis added).

The statute, however, does not make clear the extent of the activity in which each defendant must engage to be culpable as RICO conspirators: must each RICO conspiracy defendant agree that someone in the enterprise will commit two predicate crimes, must each member agree to commit two such acts individually, or must each member actually commit two such acts individually?

Both the appellants and the Government agree that the conspiracy analysis in *United States v. Elliott*, 571 F.2d 880 (5th Cir.), *cert. denied*, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978), is instructive on this question. Unfortunately, the appellants and the Government do not agree on what the Fifth Circuit meant in *Elliott*. In *Elliott* the court faced a gargantuan criminal scheme involving 6 defendants, 37 unindicted coconspirators, and, significantly, over 20 different criminal endeavors ranging from arson to murder to stealing meat and shirts. The court noted that, under pre-RICO conspiracy concepts, it doubted that a single conspiracy could be proved.[25] *Id.* at 902. Under RICO, however, a conspiracy of such diverse parts could exist, but "[t]o be convicted as a member of an enterprise conspiracy, an individual, by his words or actions, must have objectively manifested an agreement to participate, directly or indirectly, in the affairs of an enterprise *through the commission of two or more predicate crimes*." *Id.* at 903 (emphasis in original).

The Government argues that *Elliott* requires that a RICO conspiracy be established by proof that each defendant agreed to commit personally two or more predicate crimes constituting a pattern of racketeering activity. The appellants, while grudgingly admitting that the Government's view might be the least that *Elliott* requires,

argue strenuously that the case should be read to require a defendant to manifest his agreement to participate in a RICO conspiracy by actually committing two or more predicate crimes.

■ In view of the fact that coconspirators need not have accomplished their underlying criminal goals to be found guilty of conspiracy, we find it difficult to accept the appellants' argument. *See United States v. Cruz*, 568 F.2d 781, 782–83 (1st Cir. 1978) (agreement is necessary to make out a conspiracy, but not to make out substantive crime; proof of substantive crime unnecessary to make out a conspiracy). We have found the rationale in *Cruz* applicable to RICO conspiracies. *United States v. DeVincent*, 632 F.2d 155, 159 (1st Cir. 1980) (substantive count, which did not allege conspiracy, separate from RICO conspiracy charge, in which actual commission of or attempt to commit substantive crime unnecessary). Requiring one to knowingly join an enterprise and agree to commit two or more predicate crimes provides sufficient protection to those who might otherwise be convicted through guilt by association. We, therefore, hold that a RICO conspiracy count must charge as a minimum that each defendant agreed to commit two or more specified predicate crimes in addition to charging an agreement to participate in the conduct of an "enterprise's" affairs through a "pattern of racketeering activity."

■ We now turn to Count One. Paragraph 1(e) charges that all defendants

were employed by and associated with an enterprise as defined by title 18, United States Code, Section 1961(4), which enterprise was engaged in and the activities of which affected interstate commerce, to wit, a group of individuals associated in fact to fix horse races by bribery at various race tracks in the United States and to profit therefrom by wagering on the fixed races.

This was sufficient to charge a RICO enterprise.

25. In contrast to the sprawling scheme in *Elliott*, the enterprise here had only one major goal—the fixing of horse races for profit—

which it accomplished for the most part through a fairly predictable routine.

Paragraph 2 charges a conspiracy to violate 18 U.S.C. § 1962(c).[26] Paragraph 3 charges that as part of the conspiracy the defendants would conduct "the enterprise's affairs through a pattern of racketeering activity." Paragraphs 4 through 12 allege specific predicate crimes committed by each defendant: Winter is charged with six (¶¶ 4, 5, 7, 8, 10, and 11); Martorano with four (¶¶ 4, 5, 8 and 10); Price with two (¶¶ 5 and 9); Goldenberg with two (¶¶ 5 and 9). James and Charles DeMetri are, however, named only in paragraph 12 (originally ¶ 13). We have no difficulty finding that, except as to the DeMetris, Count One is legally sufficient.

We next consider the sufficiency of Count One as it affects the DeMetris. The only paragraph in which the DeMetris are mentioned is number 12, which states:

12[13]. It was further part of the conspiracy that the defendants Howard T. Winter, John Martorano, James Martorano, William Barnoski, Joseph M. McDonald, James L. Sims, Charles DeMetri, James DeMetri and unindicted co-conspirator Anthony Ciulla would purchase the horse Spread The Word for approximately $30,000, enter the horse in several races where it was planned that it would finish well out of the money because the horse would be held by the jockeys riding it in these races, and finally enter the horse in a race against inferior horses where it was planned that the horse would then win the race.

We find it difficult to construe this as alleging an agreement to commit even one predicate crime; clearly, it does not specify two predicate crimes. This paragraph is devoid of the words "bribery," and "fix or fixed races" that permeate the other paragraphs of Count One.[27]

The Government attempts to circumvent this omission by asserting that the DeMetris were properly charged with the commission of two predicate offenses in Counts Five [28] and Thirty-Two [29] of the indictment. Count

---

**26.** *See* n.4 *supra* (text of 18 U.S.C. § 1962(c)).

**27.** 4. ... to fix horse races by bribing jockeys, trainers, owners and racing officials to prevent certain horses from finishing in the top three positions in the races.

5. ... to arrange the terms on which wagering activities on fixed horse races would be handled and to collect monies resulting from wagers placed on fixed horse races.

6. ... would buy perfecta, exacta, trifecta and quinella tickets in large quantities at the race track on the fixed thoroughbred horse races.

7. ... would make telephone calls in interstate commerce and would discuss bets, wagers and other information concerning wagering on the fixed horse races.

8. ... would draw up lists of independent bookmakers in the New England area whom they would cheat by placing bets and wagers on thoroughbred horse races in which the outcomes had been, at least in part, pre-determined through the bribery of jockeys and trainers.

9. ... would cheat independent bookmakers by placing bets on thoroughbred horse races in which the outcomes had been, at least in part, pre-determined through the bribery of jockeys, and trainers.

Howard T. Winter
John Martorano
James Martorano
William Barnoski
Joseph M. McDonald
James L. Sims
Robert Duda
Melvin Goldenberg
Douglas Morello
Elliot Paul Price
Richard Donati
Charles DeMetri, and
James DeMetri
did willfully and knowingly carry into effect and attempt to carry into effect a scheme in commerce to influence by bribery a sporting contest, to wit: the defendants engaged in a scheme to bribe jockeys in the ninth race at Garden State Park, Cherry Hill, New Jersey, on February 8, 1975, which scheme was effectuated by travel between the states of Massachusetts and New Jersey and elsewhere and by the use of interstate telephone facilities to place telephone calls between the states of Massachusetts and New Jersey, and elsewhere.

All in violation of Title 18, United States Code, Sections 224 and 2.

**28.** COUNT V

On or about February 8, 1975, in the District of Massachusetts and in the State of New Jersey and elsewhere, the defendants

**29.** COUNT XXXII

On or about February 1, 1975, in the District of Massachusetts, and in the State of New Jersey, the defendants

One, however, does not incorporate by reference either Count Five or Count Thirty-Two and neither of them refers to Count One.[30] Only Count Two, which does not name the DeMetris as defendants, incorporates Count One by reference. The indictment as drawn does not admit of Counts Five and Thirty-Two being used as predicate crimes for Count One. "Each count in an indictment is regarded as if it was a separate indictment." *Dunn v. United States*, 284 U.S. 390, 393, 52 S.Ct. 189, 190, 76 L.Ed. 356 (1932). "Each count must stand on its own, and cannot depend for its validity on the allegations of another count not specifically incorporated." *United States v. Fulcher*, 626 F.2d 985, 988 (D.C. Cir.1980), *cert. denied*, 449 U.S. 839, 101 S.Ct. 116, 66 L.Ed.2d 116 (1981); *United States v. Huff*, 512 F.2d 66, 69 (5th Cir. 1975). We note also that out of forty-five overt acts, the DeMetris were named only in one, number 23, which states simply that they, along with other defendants, entered the horse Spread The Word in the ninth race at Garden State on February 8, 1975.

We find Count One legally insufficient as to Charles and James DeMetri because it fails to charge that they agreed to commit two predicate crimes. It must, therefore, be dismissed as to them and their convictions on it reversed.

 The next question is whether there was misjoinder of the DeMetris. Federal Rule of Criminal Procedure 8(b) permits joinder if the defendants "are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." The key words are the "same series of acts or transactions." We have here an indictment which originally consisted of fifty substantive counts, with forty-one of them going to the jury along with the RICO conspiracy count. Although the DeMetris were charged on two substantive counts, Five and Thirty-Two, Thirty-Two charges only that they traveled from Massachusetts to New Jersey to engage in the scheme described in Count Five: "to bribe jockeys in the ninth race at Garden State Park, Cherry Hill, New Jersey, on February 8, 1975." The indictment alleged that twenty different races at various race tracks had been fixed (Counts Three through Twenty-Two). Defendants Winter and Martorano were charged with bribing jockeys in all twenty races; Price and Goldenberg were charged with bribery in seven races. As to these four defendants, with or without a RICO conspiracy count, the indictment fairly alleged the "same series of acts or transactions."[31] But we fail to see how Counts Five and Thirty-Two bring the DeMetris within the "series." The evidence shows that active participation by the DeMetris in race fixing was limited to the scheme using the horse Spread The Word. We think it significant that they were not specifically named in paragraph 10 of Count One[32] as

William Barnoski
Robert Duda
Richard Donati
Charles DeMetri, and
James DeMetri
did unlawfully, knowingly and willfully travel in interstate commerce between Massachusetts and New Jersey, said defendants intending to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of an unlawful activity, said unlawful activity being bribery in violation of New Jersey Rev.Stat. Section 5:5–71, and did thereafter perform, attempt to perform, and cause acts to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of an unlawful activity, to wit: affecting by bribery the outcome of pari-mutuel thoroughbred horse races.

All in violation of Title 18, United States Code, Sections 1952 and 2.

**30.** Incorporation by reference from one count to another is permitted under Federal Rule of Criminal Procedure 7(c)(1).

**31.** This disposes of the claims of Price and Goldenberg that they were improperly joined.

**32.** 10. It was further part of the conspiracy that the winnings from wagering inside and outside the race tracks would be brought to Somerville, Massachusetts and divided by the defendants Howard T. Winter, John Martorano, James Martorano, Joseph M. McDonald, James L. Sims, William Barnoski, and others and unindicted co-conspirator Anthony Ciulla.

those who were to share in the winnings from the fixed races.

The prejudice to the DeMetris in being joined as RICO conspirators and tried as part of a massive race fixing conspiracy is obvious. Count One included charges, substantiated by Ciulla's testimony, of the use of force and violence to ensure compliance with the bribes. The DeMetris were not implicated in this in any way. This case is totally different from *Schaffer v. United States*, 362 U.S. 511, 80 S.Ct. 945, 4 L.Ed.2d 921 (1960), in which the court held that the dismissal of a conspiracy count does not result in misjoinder as a matter of law. In *Schaffer* there were three substantive counts and one conspiracy count. The district court dismissed the conspiracy count at the end of the Government's case for failure of proof. In sustaining the finding of no prejudice by the district court and the court of appeals, the Court noted "the proof was carefully compartmentalized as to each petitioner." *Id.* at 515, 80 S.Ct. at 947. That is not the case here; Ciulla's testimony flowed over the DeMetris like a river overrunning its banks. In *King v. United States*, 355 F.2d 700 (1st Cir. 1966), we observed:

> A joinder of offenses, or of defendants, involves a presumptive possibility of prejudice to the defendant, and of benefit to the court, by which term we include the government and the public. Although the two matters are disparate and difficult to compare, the prejudice may be relatively small, compared to the benefit, and hence tolerable.

*Id.* at 703. We do not think the prejudice to the DeMetris was within tolerable limits. With the RICO conspiracy count eliminated, the only link between the DeMetris and the other defendants was their joint participation in fixing one out of twenty races. Unlike *Schaffer*, the conspiracy count here went to the jury. In fact, after making the *Petrozziello* determination,[33] the court told the jury, "[y]ou may now consider all the

evidence introduced at this trial in making your determination as to any of the defendants' participation in the offenses charged." The court thereby wrapped the DeMetris and the other defendants in the same blanket.

The DeMetris were prejudiced beyond rescue in two ways. The RICO conspiracy count marked them indelibly as members of a massive race fixing ring that employed bribery and force and violence as its modus operandi, and the number of substantive counts and proof of fixed races in which they were not implicated could only have overwhelmed the judgment of the jury so as to make it extremely unlikely that they could consider the evidence as to the one race in which the DeMetris were involved dispassionately and in isolation.[34]

The convictions of James and Charles DeMetri are reversed.

There is one other challenge to the indictment, mainly implicating Count One, to be considered. Goldenberg claims that he was deprived of his right to be tried on the indictment as returned by the Grand Jury because the court "substantially" modified it after the evidence was closed and before submitting it to the jury.

It is "the settled rule in the federal courts that an indictment may not be amended except by resubmission to the grand jury, unless the change is merely a matter of form. *Ex parte Bain*, 121 U.S. 1, [7 S.Ct. 781, 30 L.Ed. 849]; *United States v. Norris*, 281 U.S. 619 [50 S.Ct. 424, 74 L.Ed. 1076]; *Stirone v. United States*, 361 U.S. 212 [80 S.Ct. 270, 4 L.Ed.2d 252]." *Russell v. United States*, 369 U.S. 749, 770, 82 S.Ct. 1038, 1050, 8 L.Ed.2d 240 (1962). Ancillary to this "is the rule that a portion of an indictment that the evidence does not support may be withdrawn from the jury and this is not an impermissible amendment, provided nothing is thereby added to the indictment, and that the remaining allega-

---

**33.** See next section of opinion.

**34.** We do not reach the question of whether the district court abused its discretion in denying

severance pursuant to Federal Rule of Criminal Procedure 14.

tions charge an offense." 1 C. Wright, Federal Practice and Procedure § 127, at 274–75 [hereinafter Wright]; *see Salinger v. United States,* 272 U.S. 542, 548, 47 S.Ct. 173, 175, 71 L.Ed. 398 (1926); *United States v. Coast of Maine Lobster Co.,* 557 F.2d 905, 909–10 (1st Cir.), *cert. denied,* 434 U.S. 862, 98 S.Ct. 191, 54 L.Ed.2d 136 (1977).

 We examine the "modifications" of which Goldenberg complains. The deletion of paragraph 12[35] in Count One did not affect him at all because he was not named therein. His argument that the word "defendants"—which is followed by five names in apparent apposition—could include him is spurious. Overt Act 6 originally stated: "On August 1, 1974, Anthony Ciulla telephoned John Martorano from Rhode Island and told him to bet the horse Olympia Mike across the board through bookmakers Melvin Goldenberg, Douglas Morello and Elliot Paul Price in Las Vegas, Nevada." The court deleted everything after the words Olympia Mike. It also struck from the indictment Overt Act 13 in which it was alleged that an untried defendant (Joseph M. McDonald) stated that a jockey, Edward Donnally, "should be killed and his body placed in the backstretch at Suffolk Downs as a warning to other jockeys." The court also deleted Overt Act 17, which implicated by name only defendant Winter; John Martorano, not a defendant, was also named.

These deletions were clearly a matter of form, not substance; they in no way changed or altered the indictment as to Goldenberg.

### JOINT ISSUES ON TRIAL INSTRUCTIONS

We next consider three questions raised by all appellants jointly concerning certain instructions by the trial court to the jury. *The Petrozziello Determination.*

On the twenty-first day of trial, at the close of Ciulla's testimony, the trial judge told the jury that it could consider all of the evidence introduced at trial when determining the participation of any of the defendants in the offenses charged. All defense counsel objected.

In *United States v. Petrozziello,* 548 F.2d 20 (1st Cir. 1977), we held that, in accordance with Federal Rule of Evidence 801(d)(2)(E), the trial judge rather than the jury must determine whether out-of-court declarations of coconspirators should be admitted against a defendant. *Id.* at 22. Because the judge is ruling on admissibility, not guilt or innocence, he or she is to use the ordinary civil standard in deciding whether a conspiracy has been proven: "if it is more likely than not that the declarant and the defendant were members of a conspiracy when the hearsay statement was made, and that the statement was in furtherance of the conspiracy," then the statement is admissible. *Id.* at 23.

The appellants argue first that the trial judge did not apply the standard of proof mandated in *Petrozziello.*

In the course of the bench conference on this issue, he told counsel:

I am only charged with finding that it is more likely than not that there is a conspiracy and that the defendants took part in it. I'm also charged to some extent with assessing his [Ciulla's] credibility. *And I do not find that he is so inherently incredible as to not even allow the case to go to the jury.*

What you are arguing . . . is a Motion for Judgment of Acquittal. (emphasis added).

The judge reiterated later in the same conference that he felt it more likely than not that the declarant and the defendants were members of a conspiracy between December 1973 and November 1975 when the statements in question were made and that the statements were made in furtherance of

---

**35.** 12. It was further part of the conspiracy that the defendants, Howard T. Winter, John Martorano, James Martorano, Joseph M. McDonald, and James L. Sims, would use their reputations for violence to ensure that no inde-pendent bookmaker who had been defrauded by the defendants' bets and wagers on fixed thoroughbred horse races would fail to pay the defendants.

the conspiracy. He found that Ciulla's testimony was credible and supported by independent evidence of toll records, registrations, and race charts and "that each defendant and each coconspirator had been involved sufficiently by nonhearsay evidence, including 801(d)(2) statements, which sufficiently indicate their involvement in this criminal enterprise." Such evidence left "very little choice except for the jury to believe him [Ciulla] or not."

It is apparent that the trial judge understood the standard set out in *Petrozziello*, but the timing of his decision was premature. He repeatedly relied on the "more likely than not" standard in making his decision, but made that decision based on the most important evidence in the Government's case, Ciulla's testimony. In *United States v. Ciampaglia*, 628 F.2d 632 (1st Cir.), *cert. denied*, 449 U.S. 956, 1038, 101 S.Ct. 365, 618, 66 L.Ed.2d 221, 501 (1980), decided over a year after the trial in this case, we held that the trial court should make its final *Petrozziello* determination at the close of all the evidence, out of the hearing of the jury. *Id.* at 638. We noted in *Ciampaglia* that in adopting the "more likely than not" test, "we have implicitly anticipated that the defendant's evidence would be taken into consideration"; finding out-of-court declarations admissible after hearing only the prosecutor's evidence "would render almost meaningless any difference between the standard announced in *Petrozziello* and the prima facie standard that it replaced." *Id.* Thus appellants' first argument merges with their second: that the trial judge refused to consider any of the defendants' evidence when making the *Petrozziello* ruling.

In *Ciampaglia* the defendant-appellant's failure to object at trial to the timing of the district court's finding barred him from raising the point on appeal in the absence of plain error. Here, defense counsel specifically objected to the court making preliminary findings about the coconspirators without first hearing all the evidence, or at least hearing the evidence on the membership of the alleged conspiracy. Nevertheless, we do not agree that the trial judge committed reversible error in making the ruling during the Government's case. In this regard, we are influenced by the fact that the court was operating without the benefit of controlling legal precedent on this point.[36] We note also that defense counsel did not request a reconsideration of the court's ruling when all the evidence in the case had been presented. Of greatest importance to our decision, however, is the fact that we believe that a *Petrozziello* finding at the close of all the evidence in the case would have reached the same conclusion.

Most of the evidence presented by the appellants was directed at attacking Ciulla's credibility. Several of the appellants took the stand to deny either the occurrence of, or Ciulla's version of, the events described in the principal witness's testimony. Evidence was also introduced that, if believed, would directly contradict some of Ciulla's statements. In *United States v. Mackedon*, 562 F.2d 103, 105 n.2 (1st Cir. 1977), we noted in passing that we did not "understand why a court would be barred from finding a preponderance simply because all or most of the prosecution's case depends upon the credibility of one witness." We find here that the trial judge was not prevented from finding a preponderance in this case merely because the Government's case hinged on Ciulla's testimony. Moreover, we believe that in the context of this case, the judge implicitly made such a finding by

---

**36.** In *United States v. James*, 590 F.2d 575, 582–83 (5th Cir.) (in banc), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979), the Fifth Circuit made prospective only the rule that the trial court must make the conspiracy finding at the conclusion of all the evidence. Similarly, the Eighth Circuit, in explaining that an explicit on-the-record determination regarding the admissibility of a coconspirator's state-

ment was required in future trials, also found that the absence of such a determination in the case before it was not plain error given the absence of appellate guidance on the point. *United States v. Bell*, 573 F.2d 1040, 1044–45 (8th Cir. 1978).

We refused to find our holding in *Petrozziello* retroactive in *United States v. Mackedon*, 562 F.2d 103, 105 (1st Cir. 1977).

**1142**

permitting the conspiracy charge to go to the jury.[37] In light of the judge's understanding of the *Petrozziello* standard, and his instructions to the jury, it is apparent that he would not have permitted the jury to consider the hearsay evidence if he had changed his mind and come to the conclusion that a preponderance of the evidence no longer supported the finding of a conspiracy. While the district courts will of course now follow the rule enunciated in *Ciampaglia*, we cannot, for the reasons stated, say that there was any reversible error in the procedure followed here.

*Jury Instructions on Count One.*

■ All remaining appellants also claim that the jury instructions on the RICO conspiracy count were fatally defective. We find nothing mortal, only one surface wound that does not come close to reversible error.

The trial judge began his instructions on Count One by reading 18 U.S.C. §§ 1962(c) and (d). The terms "enterprise," "conduct," "racketeering activity," "pattern of racketeering," and "interstate commerce" were correctly defined. The court then explained the elements of conspiracy and the proof required generally and in the context of this case. The Count One instruction was complete, even-handed, clear, and, except as discussed below, correct.

> Therefore, under the statutes, as distinguished from a simple conspiracy statute, you must find that the defendants did more than simply agree to join this conspiracy. You must find the following: that a defendant by his words or actions must have objectively manifested an agreement to wilfully participate, directly or indirectly, in the affairs of an enterprise through the commission of two or more offenses which make up the pattern of racketeering activity in this case, that is, *the bribery charges, the travel and use of interstate telephone charges, which are charged throughout the indictment.* (emphasis added).

Appellants contend that the italicized portion of the instruction erroneously incorporated the substantive Counts Three through Forty-Two into Count One. As already noted, there can be no assumed or implied incorporation of one count into another. But the question here is not the legal sufficiency of the indictment; it is clear that Count One charged Winter, Martorano, Price, and Goldenberg with the requisite two predicate crimes. As to these appellants, the substantive counts were not necessary to flesh out an otherwise incomplete conspiracy count as they were for the DeMetris. As we read this part of the instructions, the jury was instructed that it could not find the appellants guilty of conspiracy unless it first found that they actually committed two predicate crimes. This was error in light of our holding that a RICO conspiracy count must allege only an agreement to commit two predicate crimes, not their actual commission. The error, however, benefitted the appellants; it required the Government to prove more than was necessary. Indeed, this is what appellants have urged is required for a RICO conspiracy.

Appellants' claim of error as to the mid-deliberation instruction has not even a sem-

---

**37.** The judge's final jury instructions on this point followed the pattern set out in the pre-*Petrozziello* case of *United States v. Honneus,* 508 F.2d 566 (1st Cir. 1974), *cert. denied,* 421 U.S. 948, 95 S.Ct. 1677, 44 L.Ed.2d 101 (1975). Under *Honneus* the jury was told, either before or immediately after the first instance of hearsay testimony, that the conspiracy itself and each defendant's participation in it had to be established by independent nonhearsay evidence, *id.* at 577, and that the hearsay evidence was not to be considered unless the jury was satisfied that the defendants were in fact members of the conspiracy. *Id.* at 576. Here the judge charged in part that "to determine whether a defendant was a member of an alleged conspiracy you can consider only that evidence, if any, pertaining to his own acts and statements" and that a defendant was not responsible for the declarations of other alleged participants until it was established beyond a reasonable doubt that a conspiracy existed and that the defendant was one of its members, based upon the evidence of his own acts and statements. As we pointed out in *United States v. Fontanez,* 628 F.2d 687 (1st Cir. 1980), "[a]lthough the ghost of *Honneus* may still be flitting about, it causes no harm and ... is probably beneficial to a defendant." *Id.* at 689.

blance of validity. On the second day of deliberations the jury requested "the legal definition of a conspiracy." Contrary to appellants' assertions, the court did not merely repeat its original conspiracy instruction. It used, insofar as possible, different words and phrases to explain to the jury again the elements of Count One and the proof required. A jury request for a clarification of an instruction of a legal definition already given is particularly difficult to satisfy when, as here, the original was complete and essentially correct.[38] Because the new instruction must both be given in English and be legally sound, it is bound to follow the original.

The instructions on Count One did not amount to reversible error as to Winter, Martorano, Price and Goldenberg.

*Instructions On Intent.*

In the course of his instructions on intent, the trial judge told the jury that:

An act is done wilfully if done voluntarily and intentionally and with the specific intent to do something the law forbids, that is to say with a bad purpose either to disobey or disregard the law.

An act is done knowingly, if it is done voluntarily and intentionally and not because of mistake or accident or other innocent reason. The purpose of adding the word "knowingly" is to insure that no one will be convicted for an act done because of a mistake or an accident or other innocent reason.

Knowledge and intent exist in the mind. Since it is not possible to look into a man's mind or a person's mind to see

what went on, the only way you have for arriving at a decision in these questions is for you to take into consideration all the facts and circumstances shown by the evidence, including the exhibits, and to determine from all such facts and circumstances whether the requisite knowledge and intent were present at the time in question.

Direct proof is unnecessary. Knowledge and intent may be inferred from all the surrounding circumstances. *As far as intent is concerned, you are instructed that a person is presumed to intend the natural and probable or ordinary consequences of his acts.*

(emphasis added). Counsel objected to this charge, although their objections were hardly a model of specificity.[39]

The emphasized portion of the judge's charge is substantially identical to the jury instruction declared unconstitutional[40] by the Supreme Court in *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), which was decided on June 18, 1979, the twenty-seventh day of trial in this case. The appellants argue that use of this instruction was particularly prejudicial because the element of intent is especially important in a RICO conspiracy trial. Without clear instruction on intent, they claim a jury would be unable to separate " 'guilt by association' from guilt established by the evidence in accordance with the law."[41]

The key to determining whether the instruction operated to deny the appellants' constitutional rights is the actual effect of

---

**38.** The court repeated its original error as to the necessity of committing two or more offenses.

**39.** Besides two general objections to the charge, one attorney mentioned that the instruction "reminded" him of a Supreme Court decision, as well as a recent article on statutory presumptions, and that he felt that the instruction was a deprivation of the "Fifth Amendment right not to have to produce any evidence."

**40.** The precise language condemned by the Supreme Court in *Sandstrom* was "[t]he law presumes that a person intends the ordinary consequences of his voluntary acts." *Sandstrom*

*v. Montana*, 442 U.S. 510, 513, 99 S.Ct. 2450, 2453, 61 L.Ed.2d 39 (1979).

**41.** In view of the Supreme Court's statement in *Turkette* that the existence of an enterprise and of a pattern of racketeering activity must be separately proven, *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 2528–29, 69 L.Ed.2d 246, 4743, 4745 (1981), and our holding in this case that each defendant in a RICO conspiracy case must be charged with agreeing to commit personally at least two predicate crimes, we do not believe that a jury would be placed in such a quandary.

that charge on the jury. *Id.* at 514, 99 S.Ct. at 2454; *McInerney v. Berman*, 621 F.2d 20, 23 (1st Cir.), *cert. denied*, 449 U.S. 867, 101 S.Ct. 201, 66 L.Ed.2d 85 (1980). *Sandstrom v. Montana* holds that the instruction given here, which a reasonable juror could have viewed as a mandatory presumption, 442 U.S. at 515, 99 S.Ct. at 2455, that was either irrebuttable, or that shifted the burden of persuasion to the defendant on the element of intent, *id.* at 517, 99 S.Ct. at 2456, was unconstitutional. *Id.* at 524, 99 S.Ct. at 2459. The Court also mentioned in a footnote that the potential for the jurors adopting either of these interpretations of the presumption was not removed by the other instructions given by the trial judge: that the accused was presumed innocent until proven guilty and that the State had the burden of proving beyond a reasonable doubt that the accused caused the death of the decedent purposely or knowingly. *Id.* at 518 n.7, 99 S.Ct. at 2456 n.7.[42] The Government argues that this comment by the Court "strongly" implies that other specific instructions could have cured the effect of the presumption instruction. *Cf. United States v. Spiegel*, 604 F.2d 961, 969 n.15 (5th Cir. 1979), *cert. denied*, 446 U.S. 935, 100 S.Ct. 2151, 64 L.Ed.2d 787 (1980) (one possible reading of *Sandstrom* could allow other instructions to cure presumption instruction).

■ Generally speaking, we do not think that the intent instruction as a whole, even when coupled with the trial court's general instructions here that the prosecution always has the burden of proving each element of the crime and that no defendant has the burden of producing any evidence, obviates the possibility that jurors could give the presumption conclusive or persuasion-shifting effect. *See* 442 U.S. at 519, 99

S.Ct. at 2457. Therefore, in light of *Sandstrom*, we believe it is always error to instruct the jury that a person is presumed to intend the natural and probable or ordinary consequences of his acts, and we hold that this sort of instruction should not be used. *See United States v. Ariza-Ibarra*, 605 F.2d 1216, 1227–28 (1st Cir. 1979) (cautioning lower court to avoid language that it is ordinarily reasonable to infer person intends natural and probable consequences of acts knowingly done or knowingly omitted).

■ Nevertheless, in this case we find the error was harmless beyond a reasonable doubt, because it did not contribute to the defendants' convictions.[43] *Chapman v. California*, 386 U.S. 18, 23, 24, 87 S.Ct. 824, 827, 828, 17 L.Ed.2d 705 (1967). An error is not harmless if there exists a "reasonable possibility that the evidence [error] complained of might have contributed to the conviction." *Id.* at 23, 87 S.Ct. at 827 (quoting *Fahy v. Connecticut*, 375 U.S. 85, 86–87, 84 S.Ct. 229, 230–31, 11 L.Ed.2d 171 (1963)); *accord*, *United States v. Harrigan*, 586 F.2d 860, 863 (1st Cir. 1978) (erroneous instruction on burden of proof not harmless error; instruction may have made difference between acquittal and conviction). The challenged instruction, however, makes no sense in the context of this trial. Despite their objections to the charge, the appellants are not claiming that they did not intend the natural and probable or ordinary consequences of their acts. *See Holloway v. McElroy*, 632 F.2d 605, 618 (5th Cir. 1980) (defendant did not claim he did not intend to shoot victim, but that homicide was justified), *cert. denied*, 451 U.S. 1028, 101 S.Ct. 3019, 69 L.Ed.2d 398, (1981). Rather they deny doing what the Government has alleged that they did: meet at Marshall

---

**42.** Consideration of the other instructions given at trial in determining the effect of the presumption instruction on the jury is consistent with the view of the Court that "a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Cupp v. Naughten*, 414 U.S. 141, 146–47, 94 S.Ct. 396, 400–01, 38 L.Ed.2d 368 (1973).

**43.** The Court in *Sandstrom* refused to decide whether the use of this instruction could constitute harmless error under *Chapman v. California* even if the jury had relied upon it, because the Supreme Court of Montana had not yet considered the issue. 442 U.S. at 526–27, 99 S.Ct. at 2460–61. It noted that the state court would be free to consider the issue on remand if it wished. *Id.* at 527, 99 S.Ct. at 2461.

Motors, use the telephone to carry out bribery, downgrade Spread The Word, distribute the proceeds of unlawful activity, cause Ciulla to travel to various states to fix horse races, and the like. In contrast, the defendant in *Sandstrom* admitted that he had killed the deceased; his defense was that he had not intended to do so. If the jury assumed that Sandstrom intended the natural consequences of his act—the death of his victim—it would have had to have found that the defendant acted "purposely or knowingly" and was guilty of deliberate homicide, despite his claim that he was guilty of a lesser crime because he did not act purposely or knowingly. 442 U.S. at 512, 99 S.Ct. at 2453.

The same pattern may be found in other leading presumption cases. Thus in *Morissette v. United States*, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952), the defendant freely admitted removing spent bomb casings to sell as salvage from a federal bombing range. *Id.* at 247, 72 S.Ct. at 241–42. He maintained, however, that he had no intention of stealing, but had thought that the property was abandoned and of no value to the Government. *Id.* at 248, 72 S.Ct. at 242. The Court condemned the trial court's supposition that the only question was whether the defendant intended to take the property. The admitted and intentional act of removing the casings was not alone an adequate ground on which the jury could find criminal intent; such intent could only be determined after considering the defendant's testimony and all the circumstances surrounding the act of taking, as well as the act itself. *Id.* at 276, 72 S.Ct. at 256; *accord, United States v. United States Gypsum Co.*, 438 U.S. 422, 429–30, 434, 98 S.Ct. 2864, 2869–70, 2871–72, 57 L.Ed.2d 854 (1978) (striking down charge that if jury found admitted exchanges of price information affected prices, then parties involved presumed as matter of law to have intended that result).

We rule that there was no reasonable possibility that this instruction, which was so ill-suited to both the theory on which the case was tried and the evidence that was presented, contributed to the appellants' convictions. *Cf. United States v. Continental Group, Inc.*, 603 F.2d 444, 464 (3d Cir. 1979) (no error in using this instruction because, unlike use in *Sandstrom*, use here did not relieve burden of proving any element of crime charged), *cert. denied*, 444 U.S. 1032, 100 S.Ct. 703, 62 L.Ed.2d 668 (1980). Its use, therefore, was harmless error.

## OTHER OBJECTIONS TO JURY INSTRUCTIONS

The appellants raise objections to the trial court's jury instructions as they specifically affect their individual cases. We turn now to these contentions.

*"Theory of the Case" Instruction.*

Martorano and Winter requested the following jury instruction:

> [T]he defendant's position is that he was not involved in a conspiracy or scheme to fix horseraces by bribery at various racetracks and to profit therefrom by wagering on the fixed races. It is James Martorano's [Winter's] position that Anthony Ciulla must have falsely testified against him for reasons of his own, such as to obtain his own freedom from imprisonment by providing a target for prosecution other than himself and to obtain money from the Government and publishers.

At a bench conference on requested instructions, the court told Winter's attorney that he intended to give this "theory of the case" instruction "not in your language, as I remember it; but in substance, yes." Based on this assurance, counsel for both defendants argued to the jury that Ciulla had testified falsely against their clients for his own reasons. They argue now that the trial judge did not give the requested instruction to the jury and that they were entitled to a requested instruction on any defense theory with a foundation in the record.

Whatever the merits of appellants' legal arguments, we agree with the Government that the judge's instruction met their request. He charged the jury:

Now, you have heard testimony that Anthony Ciulla in exchange for testifying truthfully, completely and fully has been granted immunity from the government. By that I mean, and you have heard testimony to the effect, that for testifying fully, truthfully and completely Mr. Ciulla will not be prosecuted for any crimes he may have admitted in his testimony here in court, or even out of court.

. . . .

This testimony should be examined by you with greater care than the testimony of an ordinary witness. You should consider that testimony and whether it is being affected by his personal interest, his personal advantage, any prejudice he might have against a defendant or any personal antagonism he might have. Also, you may consider the record of prior convictions in your evaluation of that witness's testimony; and, after such consideration, you may give the testimony of Mr. Ciulla such weight as you believe it deserves. I will repeat for you that the testimony may be received and considered by you, even though not corroborated by other evidence, and given such weight as you feel it should have. You must, however, keep in mind that the testimony is always to be received with caution and considered with great care.

The judge also gave extensive instructions on assessment of witness credibility,[44] as well as an accomplice instruction.[45]

 A trial judge is under no obligation to deliver a requested instruction verbatim. *United States v. Irwin*, 593 F.2d 138, 141 (1st Cir. 1979); *United States v. Coast of Maine Lobster, Inc.*, 557 F.2d 905, 909 (1st Cir.), *cert. denied*, 434 U.S. 862, 98 S.Ct. 191, 54 L.Ed.2d 136 (1977). Rather,

the instruction as given must communicate to the jury the substance of the request. 593 F.2d at 140; 557 F.2d at 909. The judge's instructions in this instance clearly conveyed to the jury not only the substance of Martorano's and Winter's request, but also the heart of their theory: that Ciulla had lied for his own benefit. *See* 593 F.2d at 140–41. Martorano and Winter were not prejudiced by the trial court's charge.

In view of our disposition of this issue, we do not reach Martorano's and Winter's argument that they were misled when the trial judge failed to give the requested instruction after assuring them that he would do so.

*Character Evidence Instruction.*

In addition to testifying himself, Goldenberg called several character witnesses to testify on his behalf. Among them were the director of hotel operations at the Stardust Hotel in Las Vegas, where Goldenberg was employed from April 8, 1968 through October 8, 1974; a lieutenant in the Las Vegas police department, who from August 1974 to August 1977 headed the intelligence unit that gathered information on gambling, and who was, as a result, familiar with Goldenberg's general routine; the Director of Security for the Sheraton Corporation, who also spent 14 of his 26 years as an FBI agent in Las Vegas, and whose tasks from 1973 to 1977 included investigating interstate sports betting and bookmaking; a retired FBI agent who had been assigned to Las Vegas from 1971 through 1977 and had headed the intelligence squad that gathered gambling information from 1975 to 1977; and an undersheriff of the Las Vegas police department. Goldenberg requested that the judge give the following

---

**44.** In the course of these instructions, the judge advised the jury that witnesses could be judged by "their bias, their interest, their perception, their memory, their narration, their reputation." He instructed them to "[s]crutinize the witness's intelligence, motive, state of mind, demeanor, candor and fairness. Does the witness have an interest in the outcome of the case? That is not unusual. Most witnesses do. But, if so, does that interest affect the truthfulness of the witness's testimony?"

**45.** As part of this instruction, the court noted that the jury could find that Ciulla had been an accomplice of one or more of the defendants in the case. He instructed the jury that the testimony of such an accomplice "is always to be received with caution and considered with great care."

instruction on character evidence to the jury:

> The jury is instructed that evidence of an established reputation for honesty, veracity and integrity may be such to raise a reasonable doubt that will *alone* justify an acquittal. Proof of a good reputation for honesty, veracity and integrity of one indicted for an offense which by his [*sic*] very nature implies lack of moral rectitude *may well by itself, if believed by the jury, create such a reasonable doubt as to justify acquittal* notwithstanding the convincing nature of other evidence in the case.

(emphasis added). The judge instead instructed the jury as follows:

> Next there were character witnesses. There was evidence offered and admitted which tended to show the good reputation of a defendant in his community prior to the indictment in this case. Such evidence may indicate to you that it is improbable that a person of good character would commit the crimes charged, and, therefore, cause you to have a reasonable doubt.

> You should consider this evidence along with all of the other evidence in the case

in determining the guilt or innocence of the defendant.

Goldenberg argues here that failure to give his requested character instruction, which he asserts was authorized in *Michelson v. United States*, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948), was reversible error. In *Michelson* the Court, in the course of deciding the proper scope of cross-examination of a defendant's character witnesses, noted that it had held that:

> [A]ffirmative testimony that the general estimate of . . . [a defendant's] character is so favorable that the jury may infer that he would not be likely to commit the offense charged . . . may be enough to raise a reasonable doubt of guilt . . . and a jury in a proper case should be so instructed.

*Id.* at 476, 69 S.Ct. at 219 (citing *Edgington v. United States*, 164 U.S. 361, 17 S.Ct. 72, 41 L.Ed. 467). Leaving aside the question whether *Michelson* may have misread *Edgington*,[46] the circuit courts, despite this language in *Michelson*, have split on the permissibility of a good character "standing alone" charge. Some circuits allow such a charge, at least under certain circumstances. *See, e. g., United States v. Callahan*,[47]

---

**46.** In *Edgington* the Court was considering a charge on good character that instructed the jury that such evidence could be considered only if the rest of the evidence created a doubt about the defendant's guilt. *Edgington v. United States*, 164 U.S. 361, 365–66, 17 S.Ct. 72, 73–74, 41 L.Ed. 467 (1896). In passing upon this instruction, the Court said:

> Whatever may have been said in some of the earlier cases, to the effect that evidence of good character of the defendant is not to be considered unless the other evidence leaves in the mind a doubt, the decided weight of authority now is that good character, when considered in connection with the other evidence in the case, may generate a reasonable doubt. The circumstances may be such that an established reputation for good character, if it is relevant to the issue, would alone create a reasonable doubt, although without it the other evidence would be convincing.

*Id.* at 366, 72 S.Ct. at 73–74. This is not a holding that an instruction on the effect of good character evidence "standing alone" must be given, *see Michelson v. United States*, 335 U.S. 469, 476, 69 S.Ct. 213, 219, 93 L.Ed. 168 (1948), and, as the Ninth Circuit pointed out,

*Edgington* was striking down a limitation on the use of character evidence, not requiring "that the lack of limitation must be expressly pointed out to the jury." *Carbo v. United States*, 314 F.2d 718, 746 (9th Cir. 1963), *cert. denied*, 377 U.S. 953, 84 S.Ct. 1625, 12 L.Ed.2d 498 (1964); *cf. Black v. United States*, 309 F.2d 331, 344 (8th Cir. 1962) (nothing in *Michelson* inconsistent with interpreting *Edgington* as not requiring "standing alone" instruction), *cert. denied*, 372 U.S. 934, 83 S.Ct. 880, 9 L.Ed.2d 765 (1963).

**47.** *But see United States v. Fontenot*, 483 F.2d 315, 323 (5th Cir. 1973) (rejecting claim that "standing alone" instruction must be given; charge that character evidence should be considered along with all other evidence proper). The defendant in *Callahan* did not request a "standing alone" charge, but argued on appeal that the instruction given implied to the jury that it was to disregard good character if other evidence pointed to guilt. *United States v. Callahan*, 588 F.2d 1078, 1084 (5th Cir.), *cert. denied*, 444 U.S. 826, 100 S.Ct. 49, 62 L.Ed.2d 33 (1979). The opinion actually cited *Fontenot* in the course of discussing another recent Fifth Circuit precedent, *United States v. Leigh*, 513

588 F.2d 1078, 1085 (5th Cir.), *cert. denied,* 444 U.S. 826, 100 S.Ct. 49, 62 L.Ed.2d 33 (1979); *United States v. Lewis,* 482 F.2d 632, 637 (D.C.Cir.1973); *Oertle v. United States,* 370 F.2d 719, 726–27 (10th Cir. 1966) (in banc), *cert. denied,* 387 U.S. 943, 87 S.Ct. 2075, 18 L.Ed.2d 1329 (1967); *United States v. Donnelly,* 179 F.2d 227, 233 (7th Cir. 1950); *cf. United States v. Foley,* 598 F.2d 1323, 1337 (4th Cir. 1979) (declining to hold that "standing alone" instruction could never be required; not required when defendants did not rely solely on character evidence for their defense), *cert. denied,* 444 U.S. 1043, 100 S.Ct. 727, 62 L.Ed.2d 728 (1980). Other circuits have rejected the use of this instruction. *See, e. g., United States v. Fayette,* 388 F.2d 728, 737 (2d Cir. 1968); *Carbo v. United States,* 314 F.2d 718, 746–47 (9th Cir. 1963), *cert. denied,* 377 U.S. 953, 84 S.Ct. 1625, 12 L.Ed.2d 498 (1964); *Black v. United States,* 309 F.2d 331, 343–44 (8th Cir. 1962), *cert. denied,* 372 U.S. 934, 83 S.Ct. 880, 9 L.Ed.2d 765 (1963).

■ Unfortunately for Goldenberg, this circuit has placed itself in the latter camp. *See United States v. Lachmann,* 469 F.2d 1043, 1046 (1st Cir. 1972), *cert. denied,* 411 U.S. 931, 93 S.Ct. 1897, 36 L.Ed.2d 370 (1973). Although the *Lachmann* opinion did not specifically state what instruction the defendant in that case wanted, its citation of many of the leading cases on the subject and its disapproval of the opposing doctrine as set forth in *Oertle v. United States,* 370 F.2d at 726–27, indicate that this circuit has decided that the instruction requested by Goldenberg need not be given. *Lachmann* found the trial court's instruction to consider the "evidence concerning the defendant's reputation for honesty . . .

together with all the other evidence in the case, in determining the guilt or innocence of the defendant," to be "quite sufficient." *Lachmann* at 1046 & n.3. We reiterate our disapproval of the *Oertle* line of cases. We do not think it the proper function of the trial judge to instruct the jury as to the weight it can or may give to any particular evidence that it believes. Rather, it appears to us to be a usurpation of the jury's special function. The charge in *Lachmann* that "you should consider this evidence and give it such weight as you believe it deserves," *id.,* was, in our opinion, clearly correct. We doubt that under the *Oertle* doctrine Goldenberg would have been entitled to a good character "standing alone" charge. We are certain that under the law of this circuit the district court did not err in refusing to instruct the jury that character evidence alone may raise a reasonable doubt as to guilt.

■ Goldenberg also claims that the trial judge's charge failed to satisfy even the *Lachmann* standard, because it instructed the jury to consider character evidence along with all other evidence in the case in determining guilt or innocence. He theorizes that this might have suggested to the jury that it was required to dilute the reasonable doubt raised by the character evidence (if any such doubt was raised) with incriminating evidence. He argues that insisting on this standard is not the same as insisting on a "standing alone" instruction.

Not only does this argument signal that Goldenberg has missed the point of the *Lachmann* line of cases, it also indicates that he has not read the *Lachmann* opinion itself very closely. The trial judge in *Lachmann* told the jury that

F.2d 784 (5th Cir. 1975), which noted that an instruction that good reputation alone may create a reasonable doubt on guilt more than met the "minimum content instruction" in that circuit that such evidence, considered with all other evidence, may create such reasonable doubt. *Id.* at 785 (citing *United States v. Fontenot,* 483 F.2d 315, 323 (5th Cir. 1973)). In another case in this area, *United States v. Furr,* 528 F.2d 578 (5th Cir. 1978) (per curiam), the Fifth Circuit said that a charge that stated that reputation evidence alone could create a reasonable doubt was a component of the instruc-

tion held not to be plainly erroneous in *Fontenot. Id.* at 579. In *Fontenot,* of course, one of the bases for defendant's objections was that the charge did not include the standing alone language, but emphasized that this evidence was to be considered along with all the evidence in the case. 483 F.2d at 323. It should be noted that the propriety of using the "standing alone" terminology was not precisely at issue in either *Furr* or *Leigh*; in each case the trial judge had instructed the jury that character evidence alone could create a reasonable doubt.

evidence concerning the defendant's reputation for honesty should be considered by you, *together with all the other evidence* in this case, in determining the guilt or innocence of the defendant. If, *when considered with all the other evidence* presented during this trial, it creates a reasonable doubt in your mind as to the guilt of the defendant, you should find him not guilty.

469 F.2d at 1046 n.3 (emphasis added). Appellant's dilution contention is frivolous.

## OTHER CLAIMS OF ERROR

The appellants raise several other objections to rulings by the court below. We now consider those claims that merit discussion.

*Severance and Transfer.*

■ Price and Goldenberg claim that they were improperly joined and that their cases should have been severed and transferred to Las Vegas, Nevada. We have already concluded that their initial joinder was proper.[48] We also find that they were not entitled to a severance under Federal Rule of Criminal Procedure 14.[49] To prevail on this claim before the trial judge, Price and Goldenberg were required to "make a 'strong showing of prejudice' likely to result from a joint trial"; the denial of such a motion may be overturned only if an abuse of discretion is shown. *United States v. Thomann*, 609 F.2d 560, 564 (1st Cir. 1979); *United States v. Luna*, 585 F.2d 1, 4–5 (1st Cir.), *cert. denied*, 439 U.S. 852, 99 S.Ct. 160, 58 L.Ed.2d 157 (1978). Neither

the fact that Price's and Goldenberg's involvement in the scheme was not as extensive as that of Winter and Martorano nor their claims that they would be prejudiced by vast amounts of testimony pertinent to other defendants, but not to them, is sufficient, "either separately or in combination, to render denial of severance an abuse of discretion." *United States v. Smolar*, 557 F.2d 13, 21 (1st Cir.), *cert. denied*, 434 U.S. 866, 966, 971, 98 S.Ct. 203, 508, 523, 54 L.Ed.2d 143, 453, 461 (1977). The Seventh Circuit, in a case cited by Goldenberg, has stated that a defendant is not entitled to a separate trial only because it would provide him or her with a better chance of acquittal; a severance is mandated only when the defendant will otherwise be denied a fair trial. *United States v. Alpern*, 564 F.2d 755, 758 (7th Cir. 1977); *see United States v. Calabrese*, 645 F.2d 1379, 1385 (10th Cir. 1981). Assuming that the trial judge was swayed by considerations of judicial economy, as Price and Goldenberg claim, such considerations are relevant when there is a reasonable assurance that the defendants will receive a fair trial if not severed. *United States v. Boscia*, 573 F.2d 827, 833 (3d Cir.), *cert. denied*, 436 U.S. 911, 98 S.Ct. 2248, 56 L.Ed.2d 411, 439 U.S. 854, 99 S.Ct. 165, 58 L.Ed.2d 160 (1978). Appellants received such a trial here.

■ Nor do we think that the trial judge improperly denied Price's and Goldenberg's motions for transfer under Federal Rule of Criminal Procedure 21.[50] Turning

---

**48.** *See* n.31 *supra* and accompanying text.

**49.** This rule provides:
Rule 14. Relief from Prejudicial Joinder
If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. In ruling on a motion by a defendant for severance the court may order the attorney for the government to deliver to the court for inspection *in camera* any statements or confessions made by the defendants which the government intends to introduce in evidence at the trial.

**50.** This rule provides in pertinent part:
Rule 21. Transfer from the District for Trial.
(a) For Prejudice in the District. The court upon motion of the defendant shall transfer the proceeding as to him to another district whether or not such district is specified in the defendant's motion if the court is satisfied that there exists in the district where the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial at any place fixed by law for holding court in that district.
(b) Transfer in Other Cases. For the convenience of parties and witnesses, and in the interest of justice, the court upon motion of the defendant may transfer the proceeding as to him or any one or more of the counts thereof to another district.

first to their motions to transfer under Rule 21(b), we note that the trial court's decision to deny a change in venue is reviewable under the abuse of discretion standard. *United States v. Calabrese*, 645 F.2d at 1384; Wright § 344 at 637. Despite the distance between Las Vegas and Boston, Price and especially Goldenberg were able to call many witnesses from Nevada to testify on their behalf. The other defendants lived in New England, as did many of the Government's witnesses, and even some of Goldenberg's witnesses. (It is not clear where Tildsley, who was convicted but has not appealed, resided.) Obviously, to grant Price's and Goldenberg's motions for transfer would in effect grant their motions for a severance. The trial judge did not abuse his discretion in refusing to transfer the case under Federal Rule of Criminal Procedure 21(b).

■ As a final variation on this theme, Price and Goldenberg claim that the trial judge was presented not just with a discretionary invocation of Rule 21(b), but with a question of constitutional dimensions, stemming from the nature of the charges and their gambling-oriented backgrounds. In support of their position, they present the novel theory that denial of their motions violated their right to a jury selected from a fair cross-section of the community, because Massachusetts jurors would attach a stigma of illegality to Goldenberg's and Price's employment in the gambling industry, but Nevada jurors would not. Moreover, jurors selected from a community such as Nevada, which has accepted gambling as a matter of public policy, would be better able than jurors drawn from Massachusetts to assess the Government's theory of illegal gambling. Trial in Boston, they claim, inevitably caused an irremediable flaw in the jury selection process: the systematic exclusion of "persons with a familiarity with the gambling motif."[51] This argument is groundless as well as ridiculous. This case involves the "sport of kings" with which even the puritanical citizens of Massachusetts are familiar, some even to the point of addiction. We are concerned here not just with gambling, but with fixing races so that the element of chance is entirely eliminated. We would suspect that the defendants' approach to horse racing would be as offensive to the citizens of Nevada as to those of Massachusetts if not more so, because Nevada's main source of income derives from those who believe that they have a chance to win, be it at the roulette table or the race track.

*Refusal to Admit Polygraph Evidence.*

■ Price contends that the trial judge committed reversible error by refusing to allow him to present polygraph evidence to support his credibility against Ciulla's. Without deciding whether a *per se* prohibition against the use of lie detector tests is appropriate, we find that the trial judge acted within his discretion in refusing to admit such evidence in this case. *See United States v. Truong*, 629 F.2d 908, 930 n.27 (4th Cir. 1980) (no need to pass on admissibility of unstipulated lie detector test results because district judge did not abuse discretion by excluding them in this case).

*Allegation of Prosecutorial Misconduct.*

■ Before the trial began, appellant Price filed a motion to suppress his grand jury testimony of April 13, 1978, on the grounds that the Assistant United States Attorney prosecuting the case misled Price into waiving his constitutional rights and testifying before the grand jury by informing him that he was not a target of the grand jury investigation when he was, and failed to keep his commitment that Price would not be indicted if he testified before the grand jury unless evidence to corroborate Ciulla's testimony about him subsequently developed. Price claims that if his attorney had known that his client was a target, he would "undoubtedly" have urged Price to claim his privilege against self-in-

---

**51.** Neither Goldenberg nor Price has challenged the selection of the jury on federal statutory grounds. *See* 28 U.S.C. § 1867.

crimination or possibly have requested use immunity for him in exchange for his cooperation with the Government.

The Government did not use this testimony in its case-in-chief. Price, however, claims that his testimony was "undoubtedly used" to refresh Ciulla's memory before he testified before the grand jury that indicted Price in February 1979. He argues that because this testimony was developed through exploiting testimony unfairly obtained from him, it could not be used against him.

The trial judge conducted a lengthy pretrial hearing on this issue, permitting one of Price's attorneys to examine his cocounsel, the prosecutor, and the FBI agent assigned to the case. Following the hearing, the judge denied the motion. In a written opinion he concluded that: (1) Price was not a "target" when he appeared before the grand jury; (2) the Government did not have a sufficient basis for an indictment until it had received further evidence following Price's grand jury testimony; (3) Price was not misled, deceived, or trapped into testifying before the grand jury and his privilege not to testify was not impaired by the prosecution's conduct.

Because Price has raised what is essentially a due process claim, the key inquiry is not whether Price was technically a target, but whether the prosecutor either actually misled Price and his attorney about Price's status or made and then broke a commitment not to ask for Price's indictment unless he obtained evidence to corroborate Ciulla's story. Price's attorney testified that the prosecutor advised him by phone that, although Ciulla had furnished the Government with information concerning Price's alleged involvement in this scheme, he did not regard Price as a target and that "in no

way would Price be indicted." The prosecutor, who produced a signed summary of this conversation that he had prepared at the end of the phone call, testified that, when asked, he told Price's attorney that he did not consider Price to be a target, but that he did consider him to be a subject.[52] He denied ever telling Price's lawyer that Price would not be indicted or that he would not be indicted solely on the basis of Ciulla's testimony. He also testified to a brief conversation with Price's attorney outside the grand jury room on the day that Price testified, during which he told Price's counsel that he would inform Price that he was a subject, not a target.

Before Price testified, the Assistant United States Attorney warned him that he had a fifth amendment right to refuse to answer questions or to produce personal documents that might tend to incriminate him, that any such answers or documents could be used against him in a court of law, that he had a right to an attorney, and a right to consult with that attorney outside the grand jury room at reasonable intervals. The prosecutor ascertained for the record that Price's attorney was out in the hall. He then stated:

> Prosecutor: Okay. Now I also want to indicate to you, sir, that you are not a target of the Grand Jury. That means that you are not subpoenaed—
>
> Price: I understand.
>
> Prosecutor: Well, I want to explain on the record anyway. You are not subpoenaed here today because there is evidence at this particular point in time which is being entertained by the Grand Jury upon which could be sought an indictment of you; however, your name, in the activities that Mr. Ciulla

---

52. The prosecuting attorney testified that when defense counsel asked him if he viewed Price as a target, he responded "that target had a very technical meaning to me as defined in the United States Attorney's manual, and at ... [that] time I did not consider Mr. Price a target but I did consider him to be a subject."

The guidelines mentioned were not made part of the record in this case. In *In re Angiulo*, 579 F.2d 104 (1st Cir. 1978), we discussed the 1977 guidelines given to United States Attorneys, noting that "target" was defined as "'a person as to whom the prosecutor or the grand jury has substantial evidence linking him to the commission of a crime and who, in the judgment of the prosecutor, is a putative defendant'" and that "subject" was defined as "'a person whose conduct is within the scope of the grand jury's investigation.'" *Id.* at 105 n.1 (quoting guidelines).

and others are in, specifically, as they relate to Las Vegas, has come up in the Grand Jury investigation. That is why you are here. You understand that?

Price: Yes.

Unfortunately, as he later admitted in his testimony at the suppression hearing, the prosecutor did *not* inform Price that he was a subject. Nevertheless, we do not believe that under the circumstances presented here, Price could possibly have been misled into waiving his rights. Although the term "subject" was not specifically used, Price was warned that, although the grand jury was not considering evidence upon which he could be indicted "at . . . [that] particular point," his name had come up in the grand jury investigation in connection with the activities of Ciulla and others in Las Vegas. His counsel, whom the district court found had been informed that Price was considered a subject, remained in the corridor outside the grand jury room while Price was being examined, and Price consulted with him during the examination on another point.

The prosecutor's other warnings more than fulfilled any constitutional requirement, especially because "potential-defendant warnings add nothing of value to protection of Fifth Amendment rights." *United States v. Washington*, 431 U.S. 181, 189, 97 S.Ct. 1814, 1820, 52 L.Ed.2d 238 (1977); *cf. United States v. Crocker*, 568 F.2d 1049, 1056 (3d Cir. 1977) (although assistant United States attorney may have misled defendant's attorney by suggesting defendant not a target when he appeared before grand jury, statement not a due process violation when Supreme Court had held he need not say anything).

The trial court did not decide whether the prosecutor had made any promises to Price about whether or not he would be indicted on the basis of Ciulla's grand jury testimony. Instead he considered the evidence adduced at the hearing to conclude that Price was not a target when he appeared before the grand jury, but that later-discovered evidence supported Ciulla's information and formed a sufficient basis for Price's indictment. We do not find it necessary to reach this issue, because we do not believe that Price has satisfied by the preponderance of the evidence his burdens as moving party of production and persuasion on the issue of whether an agreement was made. *See, e. g., Franks v. Delaware*, 438 U.S. 154, 156, 98 S.Ct. 2674, 2676, 57 L.Ed.2d 667 (1978) (if hearing is held on truthfulness of factual statement in affidavit supporting warrant, defendant must establish contention by preponderance of evidence); *United States v. Dall*, 608 F.2d 910, 914, 915 (1st Cir. 1979) (defendant has burden on motion to suppress of proving his fourth amendment rights violated and that he had legitimate expectation of privacy), *cert. denied*, 445 U.S. 918, 100 S.Ct. 1280, 63 L.Ed.2d 603 (1980); *United States v. Evans*, 572 F.2d 455, 486 (5th Cir.) (in hearing on illegality of seizure of records, burden on movant to make specific factual allegations of illegality, to produce evidence, and to persuade court evidence should be suppressed), *cert. denied*, 439 U.S. 870, 99 S.Ct. 200, 58 L.Ed.2d 182 (1978). Since his evidence is legally insufficient to establish the existence of an agreement made by the prosecutor, we dismiss Price's argument that the prosecutor did not keep it.

As we have noted, Price's testimony before the grand jury was not used in the Government's case-in-chief; Price claims only that it was "undoubtedly used to refresh the recollection of Ciulla," after which Ciulla explained his activities in Las Vegas more fully. This testimony is said to have been the basis on which Price was indicted. Price, however, offered no evidence that his testimony was, in fact, used to refresh Ciulla's memory. In contrast, the Assistant United States Attorney testified specifically that he never communicated directly or indirectly to Ciulla the contents or substance of Price's grand jury testimony, and had no knowledge of any agents investigating the case doing so. In view of Price's inability to establish that Ciulla even learned of his grand jury testimony, we find his claim of prosecutorial misconduct tenuous indeed.

*Goldenberg's Claim of Error for Permitting Use of Wiretap on Cross-Examination.*

To understand Goldenberg's argument on this issue, its factual background must be outlined. A telephone conversation to which Goldenberg was a party was intercepted under authorization of the United States District Court for the District of Rhode Island. It is not clear whether Goldenberg was provided with an inventory of the intercept pursuant to 18 U.S.C. § 2518(8)(d) [53]: the Government claims that one was sent to him; he claims that he did not receive it because it was sent to the wrong address.

Prior to trial, Goldenberg moved that the Government be ordered to affirm or deny the existence of any intercepts, and if affirmed, that the Government be ordered to divulge their contents. The motion also asked that the Government affirm or deny whether such intercepts originated in proceedings relating to the indictment and whether or not the Government intended to offer the intercepts in its case-in-chief, cross-examination, or rebuttal. The magistrate denied the motion "except to the extent that the attorney for the Government shall simply state, if he has not done so already, whether or not he is aware of any such electronic surveillance." The Government replied by stating that no such surveillance would be used in the case-in-chief. Goldenberg then requested a copy of any intercept that the Government intended to use other than in the case-in-chief. The Government did not respond.

During the trial, but before he started to testify, Goldenberg made an anticipatory objection to the use of the interceptions on the ground that the Government had failed to comply with 18 U.S.C. §§ 2517 and 2518(5) and (8)(b) (claims not pressed on appeal), and that no order from the district court authorizing the wiretap had been obtained. At the start of the cross-examination of Goldenberg there was a lengthy bench conference concerning the use of the intercepts. Goldenberg claimed that using them for any purpose was prohibited by 18 U.S.C. § 2518(9), [54] because he had not been furnished "with a copy of the court order and accompanying application, under which the interception was authorized and approved" at least 10 days prior to trial. In reply, the Government stated that it had a transcript of a conversation between Goldenberg and a Rhode Island bookmaker intercepted in Rhode Island. During this conversation, the two exchanged betting information. Because Goldenberg had stated emphatically on direct examination that he had had nothing to do with illegal bookmaking, the Government attorney stated that he intended "to cross-examine him, not introduce the tape in evidence, but cross-examine him as to the fact he had such a conversation. If he continues to deny it, then, on rebuttal the Government will introduce the wiretap." The cross-examination was allowed; Goldenberg admitted that he had had such a conversation, but denied knowing that the person was a bookmaker. On redirect examination, Goldenberg's attorney put the transcript of the intercept in evidence.

The main thrust of Goldenberg's argument on appeal is that any questioning about the intercepted conversation was improper because of the Government's failure to comply with 18 U.S.C. § 2518(9). As

---

**53.** Under *United States v. Harrigan*, 557 F.2d 879, 884 (1st Cir. 1977), Goldenberg must show actual incurable prejudice arising from a violation of this section of the statute in order to have an intercept suppressed. No such showing has been made.

**54.** Under 18 U.S.C. § 2518(9):

(9) The contents of any wire or oral communication intercepted pursuant to this chapter or evidence derived therefrom shall not be received in evidence or otherwise disclosed in any trial, hearing, or other proceeding in a Federal or State court unless each party, not less than ten days before the trial, hearing, or proceeding, has been furnished with a copy of the court order, and accompanying application, under which the interception was authorized or approved. This ten-day period may be waived by the judge if he finds that it was not possible to furnish the party with the above information ten days before the trial, hearing, or proceeding and that the party will not be prejudiced by the delay in receiving such information.

noted, this section specifically provides that "the contents of any wire or oral communication intercepted pursuant to this chapter or evidence derived therefrom shall not be received in evidence or otherwise disclosed in any trial" unless each party has been furnished with a copy of the court order and accompanying application under which the authorization was approved, not less than 10 days before trial. 18 U.S.C. § 2518(9). The judge may waive this requirement if notice could not be given and the party was not prejudiced by the delay. *Id.* The Government does not claim that it fulfilled this statutory requirement.

The 10-day notice period provided by § 2518(9) is designed to give an aggrieved party such as Goldenberg the opportunity to make a motion to suppress. S.Rep.No. 1097, 90th Cong., 2d Sess., *reprinted in* 1968 U.S.Code Cong. & Ad.News 2112, 2195 (discussing original §§ 2518(9) and (10)(a), which are virtually identical to successor sections in effect at time of trial.) Although Goldenberg claims he suffered "extreme prejudice" from not receiving the statutory notice, he has not pointed out what that prejudice was, and we can perceive none. Goldenberg clearly knew the sort of information that the Government had, that it stemmed from a Rhode Island wiretap made in the course of an ongoing investigation, that the district court in Rhode Island had impounded the relevant documents, and that the Government intended to use the intercepted conversation for purposes of impeachment if Goldenberg's testimony on direct examination made such an inquiry relevant. Yet Goldenberg made no explicit motion to suppress the intercepted testimony under the statute. Moreover, the judge's permitting the evidence to be used for cross-examination could be viewed as an implicit waiver of the 10-day notice requirement. *See Furtado v. Bishop*, 604 F.2d 80 (1st Cir. 1979), *cert. denied*, 444 U.S. 1035, 100 S.Ct. 710, 62 L.Ed.2d 672 (1980). Until Goldenberg's testimony, the intercept was not even arguably relevant; the legislative history specifically states that even a motion to suppress, if filed, is not a bill of discovery for the defendant. *Id.* at 2196.

We believe that any technical violation of 18 U.S.C. § 2518(9) did not prejudice Goldenberg in any way.

■ In any event, the interception, even if not legally authorized, could be used for impeachment purposes. It is now firmly established that illegally obtained evidence may be used to impeach a defendant on cross-examination. *See United States v. Havens*, 446 U.S. 620, 627–28, 100 S.Ct. 1912, 1916–17, 64 L.Ed.2d 559 (1980); *Oregon v. Hass*, 420 U.S. 714, 717–18, 95 S.Ct. 1215, 1218, 43 L.Ed.2d 570 (1975); *Harris v. New York*, 401 U.S. 222, 224, 91 S.Ct. 643, 645, 28 L.Ed.2d 1 (1971); *Walder v. United States*, 347 U.S. 62, 65, 74 S.Ct. 354, 356, 98 L.Ed. 503 (1954).

Moreover, our reading of the transcript of the intercept shows that it was ambiguous at best: it could have been interpreted either as corroborative or contradictory of Goldenberg's testimony or as being of no consequence.

■ We also reject Goldenberg's claim that he was prejudiced by the Government's failure to reveal this same information in response to the magistrate's pretrial order that evidence of bad acts which the Government intended to use in its *case-in-chief* be disclosed to Goldenberg in camera. The order was not evaded; the only evidence of bad acts came from the intercept which, as already discussed, was used only for impeachment on cross-examination.

### The Post-Trial Motions for a New Trial.

Unfortunately the end of the trial did not silence Ciulla. Within three days of the verdict, the Boston Globe had interviewed him and published an article based on that interview. Appellants all brought motions for a new trial, to which the newspaper article was attached, alleging that Ciulla had perjured himself at the trial; appellants requested an evidentiary hearing on the motions. The district court, after hearing extensive arguments including a detailed offer of proof, denied the motions without an evidentiary hearing. Appellants claim that they were entitled to an evidentiary hearing on the new trial motions.

■ We think it clear that the standard for review is abuse of discretion. *United States v. Zannino*, 468 F.2d 1299, 1303 (1st Cir. 1972), *cert. denied*, 410 U.S. 954, 93 S.Ct. 1419, 35 L.Ed.2d 687 (1973). Even if, however, we were to accept appellants' argument that somehow the requirements of 28 U.S.C. 2255 applied, an evidentiary hearing would not be mandated.

> [I]f the claim is based upon facts with which the trial court, through review of the record or observation at trial, is familiar, the court may make findings without an additional hearing, and, as is the case for findings of the trial court generally, those findings will not be overturned unless they are clearly erroneous.

*United States v. DiCarlo*, 575 F.2d 952, 954–55 (1st Cir.), *cert. denied*, 439 U.S. 834, 99 S.Ct. 115, 58 L.Ed.2d 129 (1978).

■ The district court had just finished a forty-six day jury trial at which Ciulla was the principal witness. It had the newspaper article before it. An evidentiary hearing would not have increased the court's grasp of the facts and the issues. We have read the article and, based on what is by now an intimate knowledge of the transcript, agree with the Government that it does not show or tend to show that Ciulla lied on the witness stand. At best it would have minimal impeachment value. It was neither an abuse of discretion nor clearly erroneous for the district court to deny the motions for a new trial without an evidentiary hearing.

### CONCLUSION

We have considered all of the other objections raised by appellants and do not feel that they merit discussion. "A defendant is entitled to a fair trial but not a perfect one." *Lutwak v. United States*, 344 U.S. 604, 619, 73 S.Ct. 481, 490, 97 L.Ed. 593 (1953).

The convictions of Howard T. Winter, James Martorano, Melvin Goldenberg, and Elliot Paul Price are affirmed.

The convictions of James DeMetri and Charles DeMetri are reversed.